C. CLARENCE KASKEL, Appellant, *v.* VINCENT R. IMPELLITTERI et al., Constituting the Board of Estimate of the City of New York, et al., Respondents, and TRIBOROUGH BRIDGE AND TUNNEL AUTHORITY, Intervener, Respondent.

Submitted June 4, 1953; decided October 23, 1953.

*Harold L. Herzstein, Cecil A. Citron* and *Irving E. Kanner* for appellant. I. Subdivision 2 of section 72-k of the General Municipal Law is unconstitutional. (*Matter of Murray* v. *La Guardia,* 291 N. Y. 320; *Adams* v. *Housing Authority of City of Daytona Beach,* 60 So. 2d 663 [Fla.]; *Matter of Niagara Falls & Whirlpool Ry. Co.,* 108 N. Y. 375; *Matter of New York City Housing Authority* v. *Muller,* 270 N. Y. 333; *Matter of Tuthill,* 163 N. Y. 133.) II. Under *Denihan Enterprises* v. *O'Dwyer* (302 N. Y. 451), appellant was entitled to a hearing on the factual issue similar to the issue in that case as to whether the project area is substandard and insanitary. III. The redevelopment plan violates the provisions of the Housing and Rent Act of 1949 intended for the protection of the taxpayers and residents of the city in that it does not provide for redevelopment for predominantly residential uses; is therefore illegal and respondents should be enjoined from expending funds under it. IV. The contract between the city and Columbus Circle Apartments, Inc., violates the law on public letting. (*Matter of McNutt Co.* v. *Eckert,* 257 N. Y. 100; *Denihan Enterprises* v. *O'Dwyer,* 277 App. Div. 407.)

*Denis M. Hurley, Corporation Counsel* (*William S. Lebwohl, Seymour B. Quel, Harry E. O'Donnell, Reuben Levy* and *Benjamin Offner* of counsel), for respondents. I. Section 1 of

article XVIII of the New York Constitution was adopted with a distinct design of bringing about the clearance and rehabilitation of substandard areas. The statute which governs the instant project (General Municipal Law, § 72-k) was enacted to carry out this constitutional design. Accordingly, the instant condemnation proceeding, which complies with the requirements of the statute, is for a public purpose. (*Matter of Murray* v. *La Guardia*, 291 N. Y. 320; *Belovsky* v. *Redevelopment Authority*, 357 Pa. 329; *Matter of Slum Clearance in City of Detroit*, 331 Mich. 714; *Nashville Housing Authority* v. *City of Nashville*, 192 Tenn. 103; *Opinion of the Justices*, 254 Ala. 343; *Blakemore* v. *Cincinnati Metr. Housing Authority*, 74 Ohio App. 5; *Opinion to the Governor*, 76 R. I. 249; *Matter of Housing Authority of Charlotte*, 233 N. C. 649; *Stockus* v. *Boston Housing Authority*, 304 Mass. 507; *Schenck* v. *City of Pittsburgh*, 364 Pa. 31.) II. The governing statute properly invests duly designated municipal officials with discretion in the designation and selection of substandard areas. The record shows a substantial factual basis for the finding that the area here involved is substandard. (*Stockus* v. *Boston Housing Authority*, 304 Mass. 507; *Douthit* v. *City of Covington*, 284 Ky. 382; *Green Point Sav. Bank* v. *Board of Zoning Appeals of Town of Hempstead*, 281 N. Y. 534; *Davidson* v. *City of Elmira*, 180 Misc. 1052, 267 App. Div. 797, 292 N. Y. 723; *Matter of Mounting & Finishing Co.* v. *McGoldrick*, 294 N. Y. 104; *Dismuke* v. *United States*, 297 U. S. 167; *Magann* v. *Long's Baggage Transfer Co.*, 39 F. Supp. 742; *State* v. *Sherrill*, 136 Ohio St. 328.) III. An analysis of plaintiff's particular objections to the instant project shows that they are all lacking in merit. (*Perkins* v. *Lukens Steel Co.*, 310 U. S. 113; *Tennessee Power Co.* v. *T. V. A.*, 306 U. S. 118; *Schmoll, Inc.*, v. *Federal Reserve Bank*, 286 N. Y. 503; *Matter of Mount Hope Development Corp.* v. *James*, 258 N. Y. 510; *Knowles* v. *City of New York*, 176 N. Y. 430; *Hopkins* v. *Hanna*, 135 Misc. 750; *Ziegler* v. *Chapin*, 126 N. Y. 342; *Campbell* v. *City of New York*, 244 N. Y. 317; *Kelly* v. *Merry*, 262 N. Y. 151.)

*Samuel I. Rosenman, Max Freund, Andrew J. Schoen* and *Harvey L. Schein* for intervener-respondent. I. Subdivision 2 of section 72-k does not permit the acquisition of private prop-

erty for private use and profit and therefore does not deprive plaintiff of his property without due process of law in violation of section 7 of article I of the New York Constitution and of the Fourteenth Amendment to the United States Constitution. (*Matter of Murray* v. *La Guardia*, 291 N. Y. 320; *Burt* v. *Pittsburgh*, 340 U. S. 802; *Belovsky* v. *Redevelopment Authority*, 357 Pa. 329; *Matter of Slum Clearance in City of Detroit*, 331 Mich. 714; *Nashville Housing Authority* v. *City of Nashville*, 192 Tenn. 103; *Opinion of the Justices*, 254 Ala. 343; *Stockus* v. *Boston Housing Authority*, 304 Mass. 507.) II. Section 1 of article XVIII of the New York Constitution, insofar as it authorizes subdivision 2 of section 72-k and the granting to the city of the right to condemn the project area here involved, is not unconstitutional under the Fourteenth Amendment to the United States Constitution. (*Matter of Murray* v. *La Guardia*, 291 N. Y. 320; *Burt* v. *Pittsburgh*, 340 U. S. 802.) III. Plaintiff's contention that section 72-k does not meet the requirements of section 1 of article XVIII of the New York Constitution and is therefore unconstitutional is without merit. (*Matter of Murray* v. *La Guardia*, 291 N. Y. 320.) IV. Plaintiff is not entitled to a trial on the issue of whether the project area is substandard and insanitary. (*Betz* v. *Horr*, 276 N. Y. 83; *Ziegler* v. *Chapin*, 126 N. Y. 342; *Matter of Cruger*, 84 N. Y. 619; *Matter of Mounting & Finishing Co.* v. *McGoldrick*, 294 N. Y. 104; *Matter of Katz's Delicatessen* v. *O'Connell*, 302 N. Y. 286; *Schenck* v. *City of Pittsburgh*, 364 Pa. 31; *Jury* v. *Wiest*, 326 Pa. 554; *United States* v. *Chemical Foundation*, 272 U. S. 1; *Stockus* v. *Boston Housing Authority*, 304 Mass. 507; *Burt* v. *Pittsburgh*, 340 U. S. 802.) V. The redevelopment plan for the project does not violate the provisions of title I of the National Housing and Rent Act of 1949. The determination of the Federal Housing Administrator that the redevelopment plan meets the requirements of title I is conclusive. In any event, plaintiff has no standing to sue. (*Perkins* v. *Lukens Steel Co.*, 310 U. S. 113.) VI. The Triborough Bridge and Tunnel Authority is fully qualified under title I of the Housing and Rent Act of 1949 to enter into and carry out the contract with the city to construct and operate a garage and coliseum.

DESMOND, J. The nature of this suit and its procedural history, as well as the constitutional and statutory provisions which authorize slum clearance and redevelopment by cities, are so carefully described in the dissenting opinion as to make repetition unnecessary. The position is this: plaintiff, as a taxpayer, disputes the conclusion of various qualified public bodies and officers that the area, in Manhattan, bounded by Columbus Circle, Broadway, Eighth Avenue, Ninth Avenue, West 58th and West 59th Street, is "substandard and insanitary". Plaintiff says it is not, and demands that the courts hold a trial to settle this allegedly justiciable issue of fact. But there is no dispute as to the physical facts. In rounded figures, 20% of the land proposed to be taken is occupied by dwellings all but one of which are more than sixty years old, 7% of the site is covered by hotels and rooming houses, 34% is in parking lots where once there were outmoded buildings, and 39% is occupied by nonresidential structures. Of course, none of the buildings are as noisome or dilapidated as those described in Dickens' novels or Thomas Burke's "Limehouse" stories of the London slums of other days, but there is ample in this record to justify the determination of the city planning commission that a substantial part of the area is "substandard and insanitary" by modern tests, and that the whole 6.32 acres, taken together, may reasonably be considered a single "area" for clearance and redevelopment purposes. Power to make that determination has been lodged by the Constitution (N. Y. Const., XVIII, § 1) and the statute (General Municipal Law, § 72-k) in the city planning commission and the board of estimate, and when those bodies have made their finding, not corruptly or irrationally or baselessly, there is nothing for the courts to do about it, unless every act and decision of other departments of government is subject to revision by the courts (see *Matter of Cruger*, 84 N. Y. 619, 622; *Ziegler* v. *Chapin*, 126 N. Y. 342, 348).

The opinion of Judge VAN VOORHIS disposes of all plaintiff's contentions, except that stated in clause (D) of paragraph Twenty-Fourth of the complaint, "That the project area is not a substandard and insanitary area, and that any finding, consent or report by the defendants to the effect that such area is a substandard and insanitary area is unreasonable, arbitrary,

capricious and illegal ''. That part of the complaint apparently attempts to state a taxpayer's action under section 51 of the General Municipal Law. However, since no corruption or fraud is charged, plaintiff Kaskel, as a taxpayer, cannot succeed in such a suit, unless there is a total lack of power in defendants, under the law, to do the acts complained of (*Kittinger* v. *Buffalo Traction Co.,* 160 N. Y. 377; *Altschul* v. *Ludwig,* 216 N. Y. 459). The decisions under section 51 make it entirely clear that redress may be had only when the acts complained of are fraudulent, or a waste of public property in the sense that they represent a use of public property or funds for entirely illegal purposes. Although the plaintiff here complains of the choice of this site for clearing and redevelopment as being '' arbitrary and capricious '', we must keep in mind that this is not an '' article 78 '' proceeding dealing with a situation wherein it might be claimed that public officials, although acting within their powers, are doing so in a way that is arbitrary or capricious. The substance of plaintiff's contention in this respect is simply that this whole project is illegal because, according to him, the chosen site or area is not in fact substandard or insanitary.

There is no real question of fact here since the details as to age, condition and present use of the properties involved are undisputed and indisputable, as shown by the exhibits. Plaintiff does not dispute with defendants as to the condition of these properties or of the whole area. He is simply opposing his opinion and his judgment to that of public officials, on a matter which must necessarily be one of opinion or judgment, that is, as to whether a specified area is so substandard or insanitary, or both, as to justify clearance and redevelopment under the law. It is not seriously contended by anyone that, for an area to be subject to those laws, every single building therein must be below civilized standards. The statute (and the Constitution), like other similar laws, contemplates that clearing and redevelopment will be of an entire area, not of a separate parcel, and, surely, such statutes would not be very useful if limited to areas where every single building is substandard. A glance at the photographs, attached to the city's affidavit on these motions, shows that a considerable number of buildings in this

area are, on a mere external inspection, below modern standards because of their age, obsolescence and decay. The other exhibits confirm this. Therefore, the question here is not whether certain public officials have acted arbitrarily or unwisely in coming to a certain conclusion. Here we have a naked question of legality, that is, of power, and the particular power to make a determination on this matter of judgment has been conferred by statute on these defendants. Four different public bodies have, after adequate investigation and consideration which appears in the record, determined that this area may properly be considered substandard and insanitary (five such bodies if we include the Triborough Authority, and seven if we include the Special Term and the Appellate Division). One can conceive of a hypothetical case where the physical conditions of an area might be such that it would be irrational and baseless to call it substandard or insanitary, in which case, probably, the conditions for the exercise of the power would not be present. However, the situation here actually displayed is one of those as to which the Legislature has authorized the city officials, including elected officials, to make a determination, and so the making thereof is simply an act of government, that is, an exercise of governmental power, legislative in fundamental character, which, whether wise or unwise, cannot be overhauled by the courts. If there were to be a trial here and the courts below should decide in favor of plaintiff, there would be effected a transfer of power from the appropriate public officials to the courts. The question is simply not a justiciable one.

A persuasive authority quite closely in point is *Stockus* v. *Boston Housing Authority* (304 Mass. 507, see beginning, p. 509). There a complaint was held insufficient in law which, much like our pleading here, said that the buildings in a certain area were in fact in such physical condition that the area could not be dubbed " substandard ". The Supreme Judicial Court of Massachusetts said: " The extent that these various elements enter into and form the predominating and distinctive traits of a neighborhood is largely a matter of opinion " and a matter of " practical judgment, common sense and sound discretion ". The Supreme Judicial Court of Massachusetts pointed out that

men of training and experience might honestly differ as to whether a certain district was a slum area, but that in such cases the Legislature had undoubtedly given the local authorities power to make the determination; at page 510 of the opinion, the court pointed out that " The allegation that the dwellings in this area are in good repair and condition is not an allegation that the defendants may not reasonably adjudge otherwise ". The court stated, as is obviously correct, that the test is as to the area as a unit, and not as to any one or more particular structures, and that the allegations of the complaint stated no more than a mere opinion of the plaintiff on a perhaps debatable question which had been left by the Legislature to certain specified public officials (see, also, *Schenck* v. *Pittsburg,* 364 Pa. 31, 36; 11 McQuillin on Municipal Corporations [3d ed.], § 32.61, and decisions cited in notes to that section).

Another pertinent case is *Davidson* v. *City of Elmira* (180 Misc. 1052, affd. 267 App. Div. 797, motion for leave to appeal denied 292 N. Y. 723); the Special Term opinion, particularly at pages 1056 *et seq.* of Volume 180 Miscellaneous, is instructive and persuasive. Our decision in *Denihan Enterprises* v. *O'Dwyer* (302 N. Y. 451) is not pertinent here; among the differences between that case and this, is that, in *Denihan,* we had before us the complaint only, and that pleading stated a triable issue of fact as to whether the dominant purpose of that proposed taking was public or private.

It is not necessary, nor would it be useful, for us to measure the full possible reach of section 1 of article XVIII of the State Constitution, or section 72-k of the General Municipal Law. It is not to be assumed that responsible public officers will, in some future instance, label as " substandard or insanitary " an area in which there are no buildings at all, or fine, modern buildings only, or that they will attempt to condemn a number of such buildings by stretching the concept of " area ". Such attempts can be dealt with if and when they are made.

In addition to the appeals from the final judgment, plaintiff has appealed upon a certified question, pursuant to permission of the Appellate Division, from the order of the Appellate Division insofar as it affirms Special Term's denial of an injunction

*pendente lite.* This appeal must be dismissed (Civ. Prac. Act, § 589, subd. 4, par. [b] ; § 603; *Langan* v. *First Trust & Deposit Co.,* 296 N. Y. 60; *Evadan Realty Corp.* v. *Patterson,* 297 N. Y. 732).

The judgment should be affirmed, with costs.

VAN VOORHIS, J. (dissenting). The basis for upholding the constitutionality of this statute (General Municipal Law, § 72-k), as outlined in this dissenting opinion, has been approved and adopted in the majority opinion written by Judge DESMOND. This court is unanimously of the opinion that municipal funds can legally be spent to acquire real estate by condemnation for slum clearance, but the money authorized to be spent by this statute has to be used for slum clearance and not mainly for some other public purpose, however commendable such other purpose may be. If the purpose of this project is not primarily slum clearance, if the comparatively small number of substandard and insanitary dwellings to be eliminated could not rationally require the redevelopment of the site area as a whole, plaintiff contends that this would be an indication that the object of the project is not slum clearance but the erection of a coliseum on Columbus Circle, which is not a slum area, and which the evidentiary facts in the papers before the court indicate does not need to be redeveloped in order to eliminate the substandard buildings on or near Ninth Avenue. The necessity for linking the Columbus Circle section to the other area is not so clear, in my view, in the face of the proofs to the contrary, as to justify dismissing the complaint on motion for summary judgment.

There is no rational basis, according to plaintiff, for linking the Columbus Circle portion of the site area to the Ninth Avenue section in order to eliminate tenements on or in the immediate vicinity of Ninth Avenue. The contention is that redevelopment of the Ninth Avenue section, where some substandard and insanitary tenements are located, is unrelated to the more valuable property to be acquired in the vicinity of Columbus Circle, where there are no tenements, that these are really two separate areas, and that the small amount of slum dwellings on and near Ninth Avenue could easily be eliminated separately, and would not have been undertaken jointly except for the coliseum. If

that be true, plaintiff is entitled to enjoin the expenditure by the city of its share in the cost as a waste of public funds, regardless of however desirable a coliseum might be or however advantageous it might be to the city to have two thirds of its land cost paid from the Treasury of the United States. If the main purpose of combining these two areas is not slum clearance, but merely to lend color to the acquisition of land for a coliseum under the guise of a slum clearance project, then the combined project is not authorized by statute, and a taxpayer's action can be maintained to restrain it under section 51 of the General Municipal Law (*Denihan Enterprises* v. *O'Dwyer,* 302 N. Y. 451). In that event, the courts would not be invading the administrative province, but performing their duty in limiting administrative officials, capable and public spirited as they may be, to spending public money for purposes authorized by law.

It is undisputed that not more than 27.1% of the entire site area is occupied for dwelling purposes of any kind. Thirty-three and eight-tenths per cent of the site area is vacant land devoted to parking lots; even if some of this vacant land was formerly occupied by substandard and insanitary dwellings, there is no need to spend public funds to eliminate them since they have already been eliminated by private capital. Thirty-nine and one-tenth per cent of the site area is occupied by business or commercial buildings which have not been classified as substandard or insanitary by the municipal authorities. It does very well to cite Dickens' novels, or Thomas Burke's " Limehouse " stories of the London slums of other days, but these have nothing to do with condemning the Manufacturers Trust Building in this " slum " area, assessed at $1,500,000, in order to make way for a coliseum — a laudable object, to be sure, but not one whose connection with slum clearance is so clear as to be taken for granted without a trial.

The report of the municipal slum clearance committee, on the basis of which the Columbus Circle project was approved by the city planning commission, states that there are 243 families consisting of 602 persons now living in tenement buildings in the entire 6.32-acre site area. The estimated cost of land alone for the redevelopment project is $9,500,000, or $15,780 per person living in existing tenements. The estimated amount to be

recovered on resale is something less than one third of this sum. When it is considered that this per capita expense represents the cost of acquiring what will be merely vacant land, and that it does not include any of the expense of redevelopment by the construction of new buildings, this in itself presents a triable issue concerning whether the mainspring of the project is really slum clearance. Manifestly no such per capita land cost could be designed to extend to the 9,000 acres in New York City that the committee's report shows has been classified as slum, which is persuasive that this project would never have been undertaken for slum clearance alone. Even the above figure is computed on the hypothesis that all of the tenements in this site area are substandard and insanitary, whereas the land cost per individual slum dweller would be multiplied many times if the figures are adopted of the former chief of planning of the New York City housing authority, William C. Vladeck, who concludes, on the basis of his analysis of the area, that only 10% of the tenements therein are substandard or insanitary. Vladeck says that only 2% of the total site area is in reality slum.* Respondents contend that Vladeck is mistaken in failing to characterize all of the old law tenements (built before 1901) in the area as substandard and insanitary. He replies by asserting (what appears to be uncontradicted) that most of these tenements are equipped with sanitary toilet facilities, running water, central heating, fire retarding devices, suitable ventilation, and involve but slight violations of statutes, municipal ordinances or regulations. His report indicates that about one third in area of the city of New York consists of old law tenements. The far-reaching questions should not be decided, as it seems to me, on motion for summary judgment, whether a building can be condemned as being substandard and insanitary merely for the reason that it is an old law tenement even if it is well maintained, and under what circumstances, if at all, such an area may be labeled substandard and insanitary if but a small and apparently disconnected part of it consists of buildings so classified. Such determinations should at least be based

---

* Vladeck's basic facts are largely undisputed in the record on this appeal, but even if they were contested, it seems to me that it would not be in order to brush them aside as having no probative force on a motion for summary judgment.

upon evidence, taken at a trial. Many factors need to enter into such a decision which are not now before the court. A trial would present an opportunity for the reception of evidence concerning whether there is any rational basis for linking the Columbus Circle with the Ninth Avenue neighborhood, in order to redevelop the latter area. The evidence at present in the record is the other way. Whether this project as a whole bears any real relation to that objective is what plaintiff asks to try in court. By the judgment appealed from, his complaint has been dismissed without opportunity for a trial.

The complaint in this taxpayer's action charges that the expenditure of money for this project will constitute a waste of public funds. Waste, in this connotation, does not mean that it is claimed that the proposed coliseum will cost too much, or that the money will go for any private gain, but that funds earmarked by law for slum clearance will be " wasted " if they are spent contrary to what the statute authorizes.

It is said that plaintiff is not entitled to a trial for the reason that the city planning commission and the board of estimate have acted favorably upon the report of the slum clearance committee, and that the whole matter lies in the administrative domain into which the courts may not enter. The formulæ which the courts have adopted in defining the boundaries of administrative discretion such as " arbitrary or capricious," " bad faith ", and so forth, sometimes sound as though they involved moral turpitude, which is not what they mean in this context, nor does plaintiff charge that it is present in this case. That is not a reason on account of which the courts should refrain from restraining the expenditure of municipal funds for non-statutory purposes. Motive is not involved in the sense that it was in *Kittinger* v. *Buffalo Traction Co.* (160 N. Y. 377), where the validity of legislative action was attacked by impunging the motives of the members of a legislative body. In this case the controversial question is simply whether public funds are to be spent for one public purpose which is authorized by statute or for another and different public purpose which is not authorized by statute.

It by no means follows, if these views are correct, that buildings or vacant land which are not slum in character cannot be

condemned if that is incidentally necessary in order to redevelop a slum area. It cannot be done, however, if any slum clearance that may be involved is merely incidental to the redevelopment of other types of real property. If the existence of a few slum buildings within a particular site area is enough to divest the courts of jurisdiction to require that the dominant purpose of the project shall be the one which the statute requires, the door is opened to possible evasion of this law upon a large scale. The magnitude of the problem is disclosed by the statement in the slum clearance committee's report, which has been referred to, that 9,000 acres in the city of New York have already been classified as slum, and that 1,328 acres are proposed to be eliminated by 1955. The power of taking private property for public use is a drastic one. It has long rested in the jurisdiction of the courts to decide whether, in particular cases, it is being invoked for a public purpose. By the same token, it is in the realm of the courts to decide whether the purpose, though public, is one sanctioned by the statute. This is far from saying that it is in the power of the courts to pass upon the advisability of every project of this kind. It is enough if the courts, in specific cases, define the boundaries of what is necessarily a wide administrative discretion. But that there are such boundaries can hardly be denied. If only 2%, or 8%, or 12% — at most 20.3% — of this site area, under varying interpretations of the facts now before the court, is really substandard or insanitary, and if that be sufficient to authorize condemnation of the entire area, without any further showing that the major portion has to be included in order to redevelop the minor part, such a holding would mean that a large proportion of the city of New York could be taken under the power of eminent domain, acquiring title from one private owner and transferring it to another without substantial reason. In some measure this power undoubtedly exists, but its exercise is subject to restraints which the courts are competent to enforce.

Some guidance may be found in the definition of the term "area" in the Redevelopment Companies Law (L. 1942, ch. 845, § 3, as amd. by L. 1943, ch. 234). It is defined as "A section of a municipality wherein the planning commission finds that substandard conditions or insanitary housing conditions

exist. An area may include land whether improved or unimproved, and buildings or improvements not in themselves insanitary or substandard, the inclusion of which is deemed necessary by such commission for the effective clearance, replanning, reconstruction or rehabilitation of the area of which such land or property is a part." In order to obtain urban redevelopment by private capital, which is the object of section 72-k and similar statutes, there are necessarily occasions when it is difficult to interest private developers in new projects considered to be desirable, unless some opportunity to build is allowed beyond the exact sites occupied by the substandard and insanitary structures to be removed, and, indeed, sensible planning demands just that. Nevertheless if the analogy with the Redevelopment Companies Law has force, the language just quoted from the definition of what constitutes an " area ", establishes that land, buildings or improvements, not in themselves insanitary or substandard, are to be included only if necessary " for the effective clearance, replanning, reconstruction or rehabilitation of the area of which such land or property is a part " — viz., if it is necessary as incidental to the redevelopment of the slums themselves. The statutory power fails if real property which is not slum is included in the site area for the sake of its own redevelopment, instead of being included as an adjunct to slum property that cannot be redeveloped satisfactorily without it. In this instance, the Columbus Circle section cannot be included unless it is necessary for the effective redevelopment of the Ninth Avenue neighborhood. The facts before the court tend strongly to show, on the contrary, that redevelopment of the Columbus Circle location, which is not substandard or insanitary in character, is the dominant purpose of the project.

In considering whether defendants were entitled to judgment dismissing the complaint, Table I annexed to the Vladeck report is significant, which shows that the existing site area is occupied in the following proportions:

Parking lot ............................... 33.8%
Nonresidential uses ...................... 39.1%
Hotels & rooming houses ................ 6.8%
Elevator apartments .................... 3.3%
Walk-up apartments .................... 17.0%

Vladeck's report states that " a few buildings in the area can be construed as slum buildings " on the side toward Ninth Avenue, that the elevator apartments " would be considered standard housing under any definition ", and it concedes that the age of the apartments would tend to classify them as slums " if they had not been rehabilitated and were not being decently maintained." After stating the detailed facts of his survey of the site, Vladeck concludes that, based on these facts, and " predicated upon the accepted definition of slum dwelling, it is fair to state that at the most, less than 10% of the structures could be so considered. * * * Less than 17% of the site area and less than 8% of the assessed value of the area is devoted to walk-up apartments. Using the previous assumption that not more than 10% of these walk-up structures can be considered as slum buildings, the percentage of slum condition for the site, as a whole, becomes ridiculously small, being 2% of the area and less than 1% of the value. Further interpretation of this Table shows that almost three-quarters of the site and more than four-fifths of the value is devoted exclusively to parking lots and non-residential structures, prominent among which is the Manufacturers Trust Company building, a 22-story structure, whose assessment, with its land, exceed[s] $1,500,000. * * * Excluded from the analysis of slum conditions were the hotels, rooming houses and elevator apartments. These were excluded because of the fact that the hotels and rooming houses cater, in large, to transients and not to family groups and the two elevator buildings would be considered standard housing under any definition. * * * The area is bounded on the east by Columbus Circle and the southerly end of Central Park, certainly not a slum area. The southern frontage of West 58th Street contains a number of substantial residential buildings and even those built prior to the turn of the century show a high standard of renovation and maintenance. The frontage on the west is almost completely occupied by the Roosevelt Hospital and its new extension, and a large church building; the north side abuts a highly developed commercial street, whose structures are well maintained and fully occupied. It is interesting to note that in a survey taken by the State of New York, Division of Housing, only two years ago, the area selected in west mid-town, between 42nd Street and 56th Street,

lies entirely west of Ninth Avenue." The Vladeck report concludes that " It is obvious upon analysis of the data presented either in the report or in the survey that the Slum Clearance portion of the proposed Redevelopment Project is not the primary purpose of the proposed development."

The statements of fact in the Vladeck report are mainly undisputed in this record, although since plaintiff appeals from summary judgment dismissing the complaint, the judgment should be reversed if there is a showing of evidence creating a triable issue, even if some facts are disputed. There is no dispute that 33.8% of the site area is vacant land, which is not slum, neither is it disputed that at least 39.1% of the site area is devoted to commercial and business uses. The only adverse comment in the slum clearance committee's report against the latter property is " Non-residential structures have not been classified, but most of them can be considered obsolete, occupying land the value of which is inconsistent with the age and type of buildings." A commercial or business building, which has no violation against it, and which is not a menace to health or safety, cannot become slum simply because it may have become obsolete. The statute does not confer the power of eminent domain merely because the value of land may be inconsistent with the age and type of the building upon it. The power is given to eliminate slums. This is not to say that commercial or business structures may not be removed as part of redevelopment plans if to do so is required as an incident of rehabilitating slum area nearby; it does mean that the existence of merely obsolescent business or commercial structures is not enough, in itself, to characterize the area as slum. The commercial and other nonresidential buildings in this site area cannot, in any event, be counted for the purposes of this appeal as being in themselves substandard or insanitary, in view of the statement in the committee's report that they have not been so classified. This report contains the findings made by the committee, which were acted upon by the city planning commission and the board of estimate. Not only are no facts set forth on which a conclusion could be based that these buildings are slum, but the statement that they have not been classified as slum, is an affirmative showing that the particular features which render buildings substandard and insanitary have not been examined and analyzed by the committee,

and that no administrative determination has been made that these nonresidential buildings fall within the category required by the statute. The court may not substitute such a determination of its own where the administrative body has omitted to make one.

It thus appears beyond serious dispute that at least 72.9% of the site area consists of vacant land or commercial structures which could not under any theory be regarded as slum in character on the basis of this record.

The maps supplied by both sides show commercial buildings or parking sites exclusively on the eastern half of the plot, the side toward Columbus Circle, except for one elevator apartment house fronting on the south side of West 60th Street. There are no residential structures of any sort in the easterly three quarters of the area between 58th and 59th Streets, nor in the easterly half of the area between 59th and 60th Streets, with the exception of the elevator apartment house above mentioned.

In order to sustain the administrative findings that this whole area is substandard and insanitary, respondents are really reduced to reliance upon the 17% of the area covered by the walk-up apartments, all in the Ninth Avenue section, to the west, away from Columbus Circle. The committee's report and the Vladeck report differ in minor respects concerning the condition of these walk-up apartments, but agree that a substantial number of them are provided with proper sanitation, heating, ventilation, fire retarding devices and are otherwise habitable. The reports also agree that they are old law tenements, and consequently occupy excessive portions of the lot areas as judged by present standards. Both agree that some of them are substandard and insanitary, Vladeck placing the number in that category at 2% of the site area. This is not an unsupported conclusion; it is based on Vladeck's examination of the premises, and on the particular facts which he states exist and which are enumerated in his report. He recognizes that all of these walk-up apartments would be classified as slum if they had not been rehabilitated and were not being decently maintained. The committee report contradicts this figure of 2% only by saying that 66.7% of the residence buildings are '' badly run down '' and 12.5% are '' deteriorated ''. If these terms be con-

strued to indicate that those percentages are all slum, it would mean that about 12% of the site area is of that character.

Approximately one third of the area of the city of New York has been stated to be occupied by " old law " tenements, constructed before 1901. It may well be that they comprise a substantial part of the 9,000 acres in the city which the committee's report states are " recognized slums " which it is ultimately proposed to remove. It is possible that lack of yards, size of rooms, lack of ventilation and other characteristics of old law tenements are enough so that any or all such buildings, regardless of how they are being maintained, can be classified as substandard and insanitary in the discretion of the administrative authorities. The present record, on appeal from a summary judgment, lacks the factual detail necessary in order to decide that important point. Assuming, however, the entire 17% in area occupied by these walk-up tenements, or even the 20.3% occupied by them and the elevator apartment houses, to be substandard and insanitary, it still remains true that there is no substantial evidence in this record that it is necessary to condemn the property between these apartment houses and Columbus Circle for slum clearance purposes. That property, as has been stated, is not substandard nor insanitary in itself, nor has a basis been shown for the exercise of administrative judgment that it must be redeveloped as incidental to the redevelopment of slum areas on or near Ninth Avenue.

By the Vladeck report and affidavits plaintiff has sustained whatever burden is upon him to come forward with evidentiary facts in opposing a motion for summary judgment, and also for the purpose of the motion, to rebut the presumption of regularity of official acts. Sufficient has been shown to draw in question that the determinations of the committee, the city planning commission and the board of estimate respecting this slum clearance site, had warrant in the record and a reasonable basis in law (*Matter of Mounting & Finishing Co.* v. *McGoldrick*, 294 N. Y. 104, 108).

As already indicated, I agree that section 72-k of the General Municipal Law is constitutional, in the respects in which it is attacked, and the views that follow reflect those of the entire court. The ground of plaintiff's attack upon the validity of subdivision 2, under which respondents have proceeded, is that

it fails to prescribe standards or safeguards governing the clearance, replanning, reconstruction and rehabilitation of substandard and insanitary areas. Section 1 of article XVIII of the State Constitution adopted in 1938, authorizes the Legislature to provide for slum clearance (cf. *Matter of Murray* v. *La Guardia*, 291 N. Y. 320) "by such means and upon such terms and conditions as it may prescribe". Plaintiff takes the position that this provision is not self-executing, and that the Legislature had to specify particular means, terms and conditions to carry it into effect. The contention on this point is not so much that the Legislature has failed to define or to describe what is meant by "substandard and insanitary areas", which is the phrase used in the Constitution to define what real property may be acquired, the meaning of which is elaborated in section 2 of the Urban Redevelopment Corporations Law (L. 1941, ch. 892) and in section 2 of the Redevelopment Companies Law (L. 1942, ch. 845), but it is argued that section 72-k is defective in not being more precise than the Constitution in prescribing how the municipality is to be regulated in disposing of the land to others so as to insure that the area will be effectively replanned, reconstructed and rehabilitated. The Redevelopment Companies Law, to be sure, is somewhat more specific and limited in this respect. Projects covered by it must be designed and used primarily for housing purposes, but portions may be planned and used for business, commercial, cultural or recreation purposes appurtenant thereto (L. 1942, ch. 845, § 14, as amd. by L. 1943, ch. 234). Instead of contemplating that the municipality shall take a loss on the projects, redevelopment law companies are required to pay to the municipality the entire cost of assembling the land (§ 20). Nevertheless, except for limitation by statute to residential uses, maximum rentals and provision for partial tax exemption, the supervising agency, planning commission and local legislative body are allowed almost as much latitude in approving the design of the new projects under the Redevelopment Companies Law as in the case of section 72-k of the General Municipal Law (cf. Redevelopment Companies Law, §§ 4–5, 14–15, 17–21, 24). The constitutionality of the Redevelopment Companies Law was sustained, in these respects, in *Matter of Murray* v. *La Guardia* (*supra*).

Section 72-k of the General Municipal Law is drawn upon the basis, upheld in *Matter of Murray* v. *La Guardia,* that slum clearance is in itself a public purpose, which is separate and distinct from the objects to which the land may subsequently be devoted after being redeveloped by private capital. The State Constitution does not require that slums shall be rehabilitated exclusively by reconstruction for low cost housing, which is a different public purpose that may or may not be superimposed on slum clearance (*Matter of Murray* v. *La Guardia, supra*). Consequently, except where an applicable statute requires, the slum area may be cleared, replanned, reconstructed and rehabilitated according to any design and for any purpose which renders the area no longer substandard or insanitary. The Legislature is presumed to have interpreted those words in subdivision 1 of article XVIII of the Constitution, when it used them in section 72-k of the General Municipal Law, as having the same meaning which it ascribed to them in section 2 of the Redevelopment Companies Law (as amd. by L. 1943, ch. 234) viz., " substandard conditions and insanitary housing conditions owing to obsolescence, deterioration and dilapidation of buildings, or excessive land coverage, lack of planning, of public facilities, of sufficient light, air and space, and improper design and arrangement of living quarters ", and lack of " a sufficient supply of adequate, safe and sanitary dwelling accommodations properly planned and related to public facilities ". (Cf. Urban Redevelopment Corporations Law, § 2, L. 1941, ch. 892.) There appears to be agreement that, in general, as stated in the Vladeck report submitted by plaintiff: " It is generally accepted that a slum area is one, which because of lack of adequate open spaces and community facilities, and because of a preponderance of sub-standard buildings, does not provide an environment in accordance with the accepted standard of urban neighborhood life. A slum building, on the other hand, has been interpreted to mean a building which lacks private toilets, electric lighting, windows in each room, central heating, rooms of adequate size, adequate fire protection or a minimal standard of decent maintenance."

If the description " substandard and insanitary areas ", commonly called slums, supplies a legal standard for the determination of what a slum is, so as to validate condemnation for public

housing, urban redevelopment or under the Redevelopment Companies Law, it is equally adequate to furnish a standard by which to decide what is not a slum. All that is required by section 72-k is that the deed, lease, or other instrument by which real property is conveyed or demised by the municipality shall contain provisions requiring the purchaser or lessee to clear, replan, reconstruct or rehabilitate the property in such manner as to render certain that it shall not be substandard or insanitary in design or construction after the work shall have been completed. That is provided for by section 72-k, and is sufficient to establish its validity against plaintiff's attack.

Statutory or constitutional provisions authorizing local public agencies to undertake urban redevelopment projects for slum clearance have been adopted in at least thirty-seven States,[1] and their validity has been almost uniformly upheld.[2] Reference is

---

[1] Alabama, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, New Hampshire, New Jersey, New York, North Carolina, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Virginia, West Virginia, Wisconsin, Alaska, Hawaii, Puerto Rico and the Virgin Islands.

[2] *Opinion of the Justices*, 235 Ala. 485 (1938); *Humphrey* v. *City of Phoenix*, 55 Ariz. 374 (1940); *Hogue* v. *Housing Authority of North Little Rock*, 201 Ark. 263 (1940); *Housing Authority* v. *Dockweiler*, 14 Cal. 2d 437 (1939); *People ex rel. Stokes* v. *Newton*, 106 Col. 61 (1940); *Marvin* v. *Housing Authority*, 133 Fla. 590 (1938); *Williamson* v. *Housing Authority*, 186 Ga. 673 (1938); *Lloyd* v. *Twin Falls Housing Authority*, 62 Idaho 592 (1941); *Edwards* v. *Housing Authority*, 215 Ind. 330 (1939); *Spahn* v. *Stewart*, 268 Ky. 97 (1937); *State ex rel. Porterie* v. *Housing Authority*, 190 La. 710 (1938); *Matthaei* v. *Housing Authority*, 177 Md. 506 (1939); *Allydonn Realty Corp.* v. *Holyoke Housing Authority*, 304 Mass. 288 (1939); *Matter of Brewster St. Housing Site*, 291 Mich. 313 (1939); *Thomas* v. *Housing & Redevelopment Authority of Duluth*, 234 Minn. 221 (1951); *Laret Investment Co.* v. *Dickmann*, 345 Mo. 449 (1939); *Rutherford* v. *Great Falls*, 107 Mont. 512 (1939); *Lennox* v. *Housing Authority*, 137 Neb. 582 (1940); *McLaughlin* v. *Housing Authority of City of Las Vegas*, 68 Nev. 84 (1951); *Opinion of Justices*, 94 N. H. 515 (1947); *Romano* v. *Housing Authority*, 123 N. J. L. 428, affd. 124 N. J. L. 452 (1940); *Matter of New York City Housing Authority* v. *Muller*, 270 N. Y. 333 (1936); *Wells* v. *Housing Authority*, 213 N. C. 744 (1938); *State ex rel. Ellis* v. *Sherrill*, 136 Ohio St. 328 (1940); *Dornan* v. *Philadelphia Housing Authority*, 331 Pa. 209 (1938); *McNulty* v. *Owens*, 188 S. C. 377 (1938); *Knoxville Housing Authority* v. *Knoxville*, 174 Tenn. 76 (1939); *Housing Authority* v. *Higginbotham*, 135 Tex. 158 (1940); *Mumpower* v. *Housing Authority of City of Bristol*, 176 Va. 426 (1940); *Chapman* v. *Huntington Housing Authority*, 121 W Va. 319 (1939).

made to the article by Philip H. Hill (1952) entitled: " Recent Slum Clearance and Urban Redevelopment Laws ", in Washington and Lee Law Review (Vol. IX, p. 173) to indicate the extent of legislation of this character, and current trends in its construction and enforcement. This is, of course, a different question from whether this particular (Columbus Circle) slum clearance project falls within the authorization of the statute.

The remaining questions raised by plaintiff are not substantial. The contracts between the city and the redevelopers, described briefly as Apartments and Triborough, are adequate to insure that the area will be properly redeveloped if redevelopment is warranted. Although Triborough is a public authority, it stands in the same position respecting the projects as any outside redeveloper, and subdivision b of section 384 of the City Charter requiring sale at public auction or by sealed bids does not appear to have been violated, in view of the contingent clauses in the contracts rendering them conditional on Apartments and Triborough being the highest bidders. Although it is true that under the National Housing Act of 1949 (U. S. Code, tit. 42, § 1460, subd. [c]) Federal funds are made available for slum clearance under State auspices only where the area to be acquired is " predominantly residential in character " or where it is to be redeveloped " for predominantly residential use ", and it is conceded by defendants that 53.54% of this site will be redeveloped for residential purposes only if 18,000 square feet of parking space in the coliseum is allocated to residential uses, and that otherwise less than 50% would be devoted to residential purposes, nevertheless the question whether the Federal appropriation was authorized by the Federal statute has been held to be subject to the sole cognizance of the Federal courts (*Perkins* v. *Lukens Steel Co.,* 310 U. S. 113).

On appeal from judgment: Judgment affirmed, with costs. Lewis, Ch. J., Conway, Dye and Froessel, JJ., concur with Desmond, J.; Van Voorhis, J., dissents in opinion in which Fuld, J.. concurs.

On appeal from order: Appeal dismissed (Civ. Prac. Act, § 589, subd. 4, par. [b]; § 603; *Langan* v. *First Trust & Deposit Co.*, 296 N. Y. 60; *Evadan Realty Corp.* v. *Patterson*, 297 N. Y. 732). No opinion. LEWIS, Ch. J., CONWAY, DESMOND, DYE, FULD, FROESSEL and VAN VOORHIS, JJ., concur.

On appeal from judgment: Judgment affirmed.

On appeal from order: Appeal dismissed. [See 306 N. Y. 609.]