Van Voorhis, J. (dissenting).
The appeal is from a declaratory judgment upholding the constitutionality of former section 72-n of the General Municipal Law. Pursuant to this section, which is now repealed and has been re-enacted in modified form in article 15 of the General Municipal Law, the City of New York proposes to condemn about 95 acres in the Canarsie section of Brooklyn to be resold to private developers — who are as yet unidentified and uncommitted—for a project to be known as ” Flatlands Urban Industrial Park”, which, in the opinion of the Board of Estimate and the City Planning Commission, will be more advantageous to the future of the city than the lawful uses to which the properties are being devoted by their present owners. There is no finding that any of this area is substandard or insanitary—i.e., slum. Plaintiffs are owners of 68 private residences which are not claimed to be physically deteriorated. The statute under which condemnation is undertaken authorizes acquisition by the city without physical blight of “ vacant or predominately vacant areas”. Vacant land comprises 75% of this area. The buildings are clustered together for the most part and not scattered through the vacant lands, nor is it necessary to condemn many of them in order to *216 utilize the vacant lands except as the city planners deem it wise to enlarge the vacant area by converting residential to industrial purposes. This is not a case of slum clearance as the condemnation site was held to be in Kaskel v. Impellitteri (306 N. Y. 73). The present exercise of the power of eminent domain transcends anything involved therein. This kind of municipal redevelopment is not based on what was thought to have been the full scope of such enterprises by the New York State Constitutional Convention of 1938, for it goes beyond what is authorized by the housing article (N. Y. Const., art. XVIII) then added to the State Constitution, which provides only for low-rent housing or the reconstruction and rehabilitation of areas that are actually substandard and insanitary. This proceeding is not instituted on the basis that this area is substandard or insanitary but that the city will be improved if real property in good condition is transferred to other private owners who, in the judgment of city planners, will use it for more progressive purposes deemed to be more in accord with development of the municipality. Such a practice may bear hard on the owner, who loses the good will connected with his location (Banner Milling Co. v. State of New York, 240 N. Y. 533) and, in a world where politics is seldom absent from municipal administration, runs the risk of having his property taken from him to be transferred to more deserving owners.
Matter of Murray v. La Guardia (291 N. Y. 320) and Kaskel v. Impellitteri (supra) marked a major step beyond what had theretofore been held to be public purposes in the exercise of the power of eminent domain. Property owners had been accustomed to parting with their real estate involuntarily where required for governmental uses such as highways, public buildings, parks, or for the use of transportation or public utility corporations deemed to be affected with a public interest. In 1936 it was held that substandard and insanitary real estate could be condemned to be replaced with public housing or limited dividend housing corporations (Matter of New York City Housing Auth. v. Muller, 270 N. Y. 333). The Murray and Kasltel cases signified a departure in that there condemnation of real property was sanctioned for resale to other private owners, for ordinary private uses not affected with a public interest. The public purpose was conceived to be the elimina *217 tion of slums to which resale of the subject property to other private owners was incidental. The difference of opinion on the court in Kaskel v. Impellitteri Avas confined to Avhether the site to be condemned in that case could be classified as being slum; the court was unanimous concerning the constitutionality of the • statute there involved. Noav we are faced with a further step in the socialization process. It does not necessarily follow that because the former statute was upheld this statute must be constitutional also. In ruling upon the validity of a statute like this, we are not to proceed upon the assumption that the Legislature has plenary power or none. “ The state under the guise of paternal supervision may attempt covertly and gradually to mould its members to its will. The difference as so often is a difference of degree.” (Cardozo: The Paradoxes of Legal Science, p. 111.) I see no escape from the duty and responsibility of courts in ruling upon the constitutionality of legislation of this kind to weigh the social values which are involved, including the social value of ownership of private property, in order to determine whether the Legislature has exceeded its power under the Federal and State Constitutions.
Conceding that the poAver of eminent domain has been extended to the elimination of areas that are actually slum, the question here is whether this power can be further extended to the condemnation of factories, stores, private dAvellings or vacant land which are properly maintained and are neither substandard nor insanitary, so that their owners may be deprived of them against their will to be resold to a selected group of private developers whose projects are believed by the municipal administration to be more in harmony with the times. It begs the question, in my judgment, merely to assert that such properties are to be taken to prevent them from becoming actually blighted at some future date. It is possible that there are certain definable situations where conditions can constitutionally be eliminated which tend to produce slums, before the properties have deteriorated to that level. It is possible that some of what is contemplated by this statute, including portions of this project, could be accomplished under more limited legislation. What has been attempted under a statute in a particular instance does not determine its constitutionality which is adjudged in the light of Avhat could be done according to its *218 terms (Rosalsky v. State of New York, 254 N. Y. 117, 121; McKinney’s Cons. Laws of N. Y., Book 2, Part 1, Constitutional Interpretation, n. 39, p. 40). The 1958 statute sub judice is not satisfied by eliminating slums. It provides for the elimination -of potential slums, which means anything that city planners think does not conform to their designs.
It might be thought, perhaps, that in the march of progress there is no limit to the power of the Legislature even short of authorizing municipal officials to determine, through zoning or eminent domain, who shall be permitted to own real estate in cities and to what purpose each separate parcel may be devoted. The sound view is still, however, that due process includes substantive as well as merely procedural limitations and that under the mores of the day there are substantive limits to what municipalities can do with private property, even by means of statutes enacted under the spur of single-minded city planners imbued with evangelistic fervor. At some stage the rights of private property owners become entitled to be respected, even if their use of their properties does not coincide with the ideas, however enlightened, of the avant garde. The public theorists are not always correct; if they had full sway a century and a quarter ago the country would have invested its substance in the construction of canals, which any intelligent theorist would have seen was the effective way to promote the economic development of the United States. The railroads were just around the corner, but their advent was obvious to nobody. Imposing some constitutional limit to the extremely wide scope of this statute would be a far cry from returning to the days of laissez faire. There are those among whom the writer is one who believe that, although the Constitution does not enact Mr. Herbert Spencer’s Social Statics, it nevertheless holds substantive content in social matters and does mandate, at the minimum, some sort of economic or social middle way. It is not for the courts to question the wisdom of the Legislature in exercising the discretion which it has within constitutional limits, but there are limits to legislative power in dealing with private property and in my view they are exceeded by the breadth of the statute on whose constitutionality we are now ruling. The fundamental principle of government still applies which the mentor of the young Cyrus tried to implant in him in *219 ancient Persia. "When asked whether a ruler should compel a subject whose coat was too large for him to trade it with another whose coat was too small, if one of them objected to the exchange, the young future ruler replied in the affirmative, for the reason that then each would have a coat that fitted him. The mentor told him that he was wrong, since he had confused expediency with justice. The question here, it seems to me, is where to draw the line between supposed expediency and justice. In Berman v. Parker (348 U. S. 26), the actual decision of the court did not go beyond what this court decided in Kaskel v. Impellitteri (306 N. Y. 73, supra), where it was recognized in both opinions that land, buildings or improvements, not in themselves insanitary or substandard, may be included in the condemnation site if necessary for the effective clearance, replanning, reconstruction or rehabilitation of the essentially slum area of which such land or property is a part. The question before the United States Supreme Court in the Berman case was whether a department store could be condemned which was so connected with a blighted area that the latter could not be rehabilitated without including the land occupied by the store. That was not a case, like this, of so-called ‘1 intangible blight. ’ ’ The principal area there was substandard and insanitary without dispute: 64.3% of the dwellings in it were beyond repair, 18.4% needed major repairs, only 17.3% were satisfactory; 57.8% of the dwellings had outside toilets, 60.3% had no baths, 29.3% lacked electricity, 82.2% had no wash basins or laundry tubs, 83.8% lacked central heating. All of those circumstances were noted in the opinion of the court by Mr. Justice Douglas, who recognized that there was a basis on which the municipal planning commission could determine that the subject property was so interrelated with the slum properties that the latter could not be effectively eliminated without the former. Although the opinion uses broad language in certain paragraphs, which do speak of unlimited power in the planning commission, these obiter dicta should be limited and construed by what the same Supreme Court Justice said in his dissenting opinion in United States v. Wunderlich (342 U. S. 98, 101): “ Absolute discretion is a ruthless master. It is more destructive of freedom than any of man’s other inventions.” Nothing in the facts decided in Berman contravenes, *220 it seems to me, the trenchant statements in the opinion in the same case of the three-judge District Court (Schneider v. District of Columbia, 117 F. Supp 705, 719-720), which are perhaps more applicable to this case than to that in which the words were spoken:
“ Even if the line between regulation and seizure, between the power to regulate and the power to seize, is not always etched deeply, it is there. And, even if we progress in our concepts of the ‘ general welfare ’, we are not at liberty to obliterate the boundary of governmental power fixed by the Constitution.
“ The terms ‘ public use ’ and ‘ public purpose ’ have never been defined with precision, and cannot be. Localities, customs and times change, and with them the needs of the public may change. But even the most liberal courts have put boundaries upon the meanings. One eminent authority * sums up the matter by saying that the courts which go furthest in sustaining the power of eminent domain hold that £ anything which tends to enlarge the resources, increase the industrial energies, and promote the productive power of any considerable number of the inhabitants of a section of the state, or which leads to the growth of towns and the creation of new resources for the employment of capital and labor ’ constitutes a public use. We think so unqualified a definition cannot be sustained, because every factory or mercantile house of any size meets that definition to some degree, and most certainly the Government has not an unrestricted power to seize one man’s property and sell it to another for the building of a factory or a store. The decisions of the courts which used such sweeping language and which are cited to us fall far short of supporting the contention made to us in the present case. We shall discuss them in a moment.
“It is said that the established meaning of eminent domain includes measures for the ‘ general welfare ’ and that new social doctrines have so enlarged the concept of public welfare as to include all measures designed for the public benefit. The difficulty lies somewhat in the unqualified philosophical declaration, but it lies more in the practicality that some person or persons must determine, if that be the rule, what is the public *221 benefit. Therein lies the insuperable obstacle, in the American view. There is no more subtle means of transforming the basic concepts of our government, of shifting’ from the preeminence of individual rights to the preeminence of government wishes, than is afforded by redefinition of ‘ general welfare ’, as that term is used to define the Government’s power of seizure. If it were to be determined that it includes whatever a commission, authorized by the Congress and appointed by the President, determines to be in the interest of ‘ sound development ’, without definition of ‘ sound development ’, the ascendancy of government over the individual right to property will be complete. Such ascendancy would logically follow over the rights of free speech and press, it seems to us.”
Few more persuasive illustrations could be found than the statute (not necessarily the particular project) now before us for decision of situations where “ Absolute discretion ”, in the language of Mr. Justice Douglas, can be “ more destructive of freedom than any of man’s other inventions.” I do not imply that this power necessarily would be used to that end, but it potentially can be so employed. The constitutionality is to be tested by what can be done under this statute. If we uphold its validity, that means upholding everything which is an integral part of the act that can be done under its language.
Whether or not a proposed condemnation is for a public purpose is a judicial question (Denihan Enterprises v. O’Dwyer, 302 N. Y. 451, 457). Perhaps the power of eminent domain might be invoked for the rehabilitation of vacant areas subdivided into lots of such irregular form and shape or insufficient size, depth, or width, as to render them incapable of effective or economic development; or rendered sterile by obsolete or poorly designed street patterns with inadequate access to such vacant areas rendering them unsuitable for appropriate development. It is possible that there are other conditions enumerated in former section 72-n of the General Municipal Law which could furnish a basis for condemnation. Nevertheless this act contains, in my judgment, fundamental defects which invalidate it. Thus it declares that in event of any of the factors existing which are enumerated in subparagraph a of subdivision 1, ‘ ‘ with or without tangible physical blight,” real property may be *222 condemned if such areas impair or arrest “ the sound growth of-the community and tend to create slums and blighted areas.” Among- the factors enumerated are unsuitable topographical or other physical conditions impeding the development of appropriate land uses; an obsolete system of utilities serving the area, whatever that may mean; buildings and structures unfit for use and occupancy as a result of age, obsolescence, improper uses and conditions which adversely affect the general welfare; scattered improvements which retard the development of the land. When asked upon the argument of the appeal whether this means that the power' of eminent domain may be invoked in any case of this nature where, in the judgment of municipal officers, the property should be acquired and sold to some other private owners who would agree to use it for purposes that would accord more nearly in their judgment with the progress of the municipality, the Corporation Counsel replied in the affirmative. He could hardly do otherwise, in view of the language of the statute.
Neither is it sufficiently clear or definite what constitutes a “ predominantly ” vacant area. In order that the power of eminent domain may be invoked for this purpose, under this statute the area to be condemned must be ‘1 vacant ” or “ predominantly vacant.” In the case of this project it appears that the area is 75% vacant. We were told upon the argument that it would be enough if it were 50% vacant. The land which is occupied by buildings (plaintiffs’ own 68 private residences which have not been found to be in inferior condition or improperly maintained) appears to be linked to the project for the reason that a larger area than the vacant land is needed for the proposed industrial park, rather than that it is an integral part of an “ intangibly ’ ’ blighted area. However that may be in regard to this particular project, no such limitation is imposed by the statute itself whose constitutionality is being tested, which purports to render a finding by the governing body conclusive that an area to be condemned is “ predominantly vacant ” so as to enable almost any proportion of buildings to be condemned along with vacant land.- On the basis of indefiniteness alone it seems to me that this statute fails to meet recognized constitutional requirements (People v. Grogan, 260 N. Y. 138,145 et seq.). Although the requirement of definiteness is most frequently *223 presented in criminal cases, it has equal application to sumptuary statutes such as this depriving persons of property in invitum.
For the reasons stated, I dissent and vote to reverse the judgment appealed from and to grant to the plaintiffs the relief demanded in the complaint.
Judges Dye, Fuld, Froessel, Burke and Foster concur with Chief Judge Desmond ; Judge Van Voorhis dissents in a separate opinion.
Judgment affirmed.

 2 Nichols, Eminent Domain (3d ed., 1950), § 7.2 et seq.