Marvin R. Dye, J.
The Rochester Gas & Electric Corporation (hereinafter R G & E) has challenged the right of the City of Rochester to condemn certain real property owned by it, on the ground that such property is already being devoted to a “ public use ”. A trial without a jury has been had pursuant to an order of severance made and entered at Special Term, Supreme Court, Monroe County [Lambíase, J.] under date of December 11, 1965, at which time substantially undisputed testimony was adduced which fully supports essential and ultimate facts, viz:
R G & E is an operating public utility engaged in the sale and distribution of gas, electricity and steam in various classes of service to various consumers in and about the City of Rochester, Monroe County, and neighboring counties and com *856 munities. As an integral part of its operation, R G & E owns, maintains and operates a system control center, which is located in a large modern building at the northeast corner of the intersection of Front and Andrews Streets in said city. The control center houses the departments of steam, transportation, load distribution, line operating and message centers.
Directly opposite the system’s control center on the west side of Front Street, R G- & E owns real property which was purchased in about the year 1930 with the intention of ultimately using it as a site of an electric substation to serve anticipated expanding needs in the central business area. In the meantime the property has been used in conjunction with the system control center for the private parking of company vehicles.
On or about October 15,1965, the City of Rochester instituted the within Genesee Crossroads Condemnation Proceeding No. 4 to acquire property for the use and development of the G-enesee Crossroads Urban Renewal Project NYR-80, a concededly “ public.purpose ”. The included property owned by R G- & E has been designated as Condemnation Parcels Numbers 3-1, 3-9, 3-12, 3-13 and 3-14. To sustain its challenge to the legality of the proposed taking, R G & E points to a long-established general rule that the general power of condemnation does not extend to property devoted to a prior “ public use ” (Matter of Boston & Albany R. R. Co., 53 N. Y. 574; Matter of Rochester Water Comrs., 66 N. Y. 413; Matter of Mayor, etc. of City of New York, 135 N. Y. 253) unless the circumstances are “ special, unusual and peculiar” and unless “the intention of the legislature that such lands should be so taken is shown by express terms or necessary implication ” (New York Cent. & Hudson Riv. R. R. Co. v. City of Buffalo, 200 N. Y. 113, 117, 118), which principle applies even though the property devoted to a prior ‘ ‘ public use ” was acquired by purchase and not by condemnation (Matter of Mayor [East 161st St.], 52 Misc. 596, affd. 135 App. Div. 912 [1st Dept., 1909], affd. 198 N. Y. 606). Nor does the inhibition of the “ prior use ” rule apply when the lands proposed to be taken are not indispensable for the owner’s present or future purpose (Matter of New York Cent. & Hudson Riv. R. R. Co. v. Metropolitan Gas-Light Co., 63 N. Y. 326, 335).
Here, we have a situation that is on its face, ‘ ‘ special, unusual and peculiar ” in that the right of condemnation is being used to deal affirmatively with the crucial problem of urban decay and its clear and growing menace to the economic and social well-being of the city. No one quarrels with the desirability of the Crossroads Project. The area was a deplorable slum which could only be effectively dealt with by acquiring and clearing all *857 of the property either by purchase or condemnation. The presence of an exempted property in the midst of the project would have entailed additional and unnecessary difficulties in the preparation and development of the site as a unified whole. Nor can it reasonably be said that the lands sought to be taken are absolutely indispensable to the operation of R. Gr & E, either for the parking of its vehicles, which, by the way, is a purely private, proprietary purpose to the exclusion of the public (Deniham Enterprises v. O’Dwyer, 302 N. Y. 451; Matter of Incorporated Vil. of Garden City, 217 N. Y. S. 2d 827, affd. 15 A D 2d 513) or its anticipated future use as the site of an electric substation (Matter of New York Cent. & Hudson Riv. R. R. Co. v. Metropolitan Gas-Light Co., supra). There are other nearby sites available for the parking of vehicles, not the least of which is the large underground parking facility within the Crossroads Project. Also it appears that R G & E has an electric substation at Broad and Water Streets, adjacent to the southeast corner of the Crossroads Project. It has another site at Platt Street and Commercial Street one block removed, which is also available for an electric substation. Modern engineering techniques and the facilities for the transportation of electric power in bulk and its reduction to customers’ needs present no serious problems in construction or operation of the facilities necessary to supply the needs of the Crossroads development. The condemnation of the lands in question will interfere to some extent with the even tenor of the utility’s daily life and will, no doubt, be an inconvenience, but it will not be destructive of its ability to discharge its legal obligation to the public. An examination of the underlying statutory authorities dealing with urban decay makes it abundantly clear that the Legislature intended to permit a city to use its right of condemnation in a situation such as this. All levels of government have expressed concern over the insidious and burgeoning problem of city slums. The Congress of the United States regards the debilitating effect of slums as a matter of national concern. By a series of enactments, the Congress has evolved a public policy to the effect that slum clearance and urban redevelopment is essential for the general welfare and security of the Nation and the health and living standards of its people and 11 to facilitate commimity development and redevelopment ” and recognized that such needs cannot be met 1 ‘ through reliance solely on private enterprise ”; it has provided the means for granting financial assistance to localities undertaking the elimination and redevelopment of slum areas upon a showing that ‘1 the urban renewal plan conforms to a general plan for the development of the locality as a whole ” *858 (Housing Acts of 1947 and 1948 — Slum Clearance & Urban Renewal Act of 1949, U. S. Code, tit. 42, § 1441 et seq.) The Legislature of the State of New York has co-operated with the national program in the enactment of the urban renewal law as article 15 of the General Municipal Law (L. 1961, ch. 402). The Legislature, in clear and unequivocal terms, has deemed the existence of slum or blighted areas a matter of great concern as such an area “ constitutes a serious and growing menace, is injurious to the public safety, health, morals and welfare, contributes increasingly to the spread of crime, juvenile delinquency and disease, necessitates excessive and disproportionate expenditures of public funds for all forms of public service and constitutes a negative influence on adjacent properties impairing their economic soundness and stability, thereby threatening the source of public revenues ” and accordingly, has declared it to be a state policy that ‘ ‘ In order to protect and promote the safety, health, morals and welfare of the people of the state and to promote the sound growth and development of our municipalities, it is necessary to correct such substandard * * * blighted * * * conditions * * * by the clearance, replanning, reconstruction, redevelopment, rehabilitation, restoration or conservation of such areas ” (General Municipal Law, § 501). To implement such policy, broad comprehensive powers have been conferred upon the municipalities to deal with the problem, including among other things, the right and power to 1 ‘ acquire by * * * condemnation or otherwise, in accordance with the provisions of appropriate general, special or local law applicable to the acquisition of real property * * * or any interest therein necessary for or incidental to a program of urban renewal ” (General Municipal Law, § 506, subd. 1), the constitutionality of which enactment has been approved (Cannata v. City of New York, 11 N Y 2d 210, app. dsmd. 371 U. S. 4 [1962]).
The Council of the City of Rochester, in adopting the resolution, unanimously found after a duly noticed public hearing, that the Crossroads Project area is “ substandard, insanitary, slum, blighted, decadent area and tends to impair or arrest the sound growth and development of the City of Rochester and that it is detrimental and a menace to the safety, health and welfare of the inhabitants and users thereof and of the locality at large ” (p. 189) and qualifies as an eligible project area under article 15 of the General Municipal Law of the State of New York under the provisions of subchapter I of the Housing Act of 1949, as amended (City Council Proceedings, 1965, Resolution 63-79 [p. 188]).
*859 Conscious of the public policy enunciated by the Constitution which the Legislature has implemented by the enactment of a broad comprehensive scheme for the clearance and redevelopment of blighted urban areas, it is clear that the intention is to treat all properties embraced in an eligible project as a single unit, else the beneficent purpose sought to be achieved be thwarted in whole or in part at the very threshold of the enterprise. The limitation sought to be applied here is not at all consistent with this awakened approach in dealing with the evils of slum (cf. Kaskel v. Impellitteri, 306 N. Y. 73; N. Y. Const., art. XVIII, § 1; General Municipal Law, § 506 [subd. 1] et seq., formerly 72-k to 72-o).
As we know, statutes designed to promote the public good are to receive a liberal construction and be expounded in such a manner that they may, so far as possible, attain the end in view (McKinney’s Cons. Laws of N. Y., Book 1, Statutes, § 341). In sum, this is a situation where the prior ‘1 public use ’ ’ must yield to the imperative of the greater public need. Notwithstanding such ruling, B G & E will suffer no monetary loss because of the taking. Both Federal and State Constitutions guarantee that private property shall not be taken for public use without just compensation (U. S. Const., 5th and 14th Amdts.; N. Y. Const., art. I, § 7, subd. [a]).
For these reasons, the first affirmative defense raised by the respondent B G & E should be and hereby is stricken as insufficient.