James Gibson, J.
This proceeding was commenced in the County Court of Schenectady County and upon the certificate of the Judge of the County Court of his disqualification was, by stipulation of the parties and by order of the Supreme Court, duly transferred to the Supreme Court; and, pursuant to the order of the Administrative Judge, was brought on for hearing before the undersigned Justice; was tried on January 20 and 21, 1975 and was finally submitted (CPLR 4213, subd [c]; Condemnation Law, § 11) on April 19, 1975 with the filing of respondents’ reply brief.
The Schenectady Urban Renewal Agency, the petitioner in this condemnation proceeding, was established by chapter 339 of the Laws of 1968 (General Municipal Law, § 668) to accomplish any or all of the purposes specified in articles 15 and 15-A of the General Municipal Law and article XVIII of the New York State Constitution, with all the powers and duties conferred by article 15-A upon municipal urban renewal agencies generally.
The basic Schenectady Downtown Urban Renewal Project-Urban Renewal Plan, dated September 15, 1971 and now in effect, was adopted on November 15, 1971, after appropriate proceedings by the agency, the city planning commission and the common council, successively, and upon compliance with all statutory requirements in respect of notice, hearing and findings. The project and plan as then approved were and are in all respects valid and effective, and there is no contention to the contrary.
The issues in this case involve, rather, a later amendment, *765 whereby the boundaries of the project were extended to embrace additional properties, including that of the respondents, pursuant to recommendation of March 7, 1973 by the agency, followed by approval and recommendation of May 9, 1973 by the commission and final adoption on May 29, 1973 by unanimous vote of the council. Again, there is no contention that the statutory procedural prerequisites to the ultimate approval of the amendment were not literally followed; and respondents’ attack is grounded on other factors.
The issues, then, as stated in respondents’ brief, arise upon their contentions that (1) the petitioner intends no valid public use or purpose for respondents’ property, but, in any event, invokes methods and procedures violative of respondents’ constitutional rights; (2) petitioner has not negotiated the acquisition of the property in good faith; (3) petitioner is an illegally constituted body; and (4) the planning commission’s vote was void because one of the members should have disqualified himself.
The effect of the challenged extension of the project’s original boundary lines, was to add a parcel of land abutting the northerly line of State Street — which extends through the project as originally bounded — and adjoining, also, the railroad, whose tracks cross State Street overhead — the line of the railroad having been the westerly boundary of the original project; the additional parcel abutting, also, lands previously acquired for the project and subsequently redeveloped as the "State-Erie Parking Lot”. The additional parcel includes the so-called Ellis Building and respondents’ building, each a commercial building on a relatively narrow and shallow lot, respondents’ property being that nearer the project as originally bounded, and now lying between the west line of the project and the east line of the Ellis Building, with which it shares a common wall.[1] Thus, if the reasonableness of the extension were before the court, it would have to be found that, superficially at least, the municipal action was not unreasonable or illogical.
Respondents’ contention that no valid public purpose or use *766 is intended for their property seems to rest primarily on the unwarranted assumption that a plan for the use of the property should have been formulated prior to its acquisition. That such is not the sequence of urban renewal procedures is a matter of common knowledge. It is equally well known — and, in the very nature of things, completely understandable — that any such procedure — however tidy and desirable — is, in most cases, simply impossible, as a practical matter. Accepting — as the parties do and the court must — the validity of the project as originally delineated, the subsequent annexation of the immediately adjacent properties of Ellis and the respondents could not be found constitutionally impermissible, as urged by respondents, except upon a far stronger factual demonstration than this record affords.
The finding of "public purpose”, which respondents deny, cannot be successfully challenged upon this record. That requisite finding has been made by the State Legislature, by State statute and by act of the local legislative body thereunto duly deputized. In Amsterdam Urban Renewal Agency v Bohlke (40 AD2d 736), the trial court dismissed the petition "because the appellant [agency] failed to produce evidence that respondent’s property was taken for public purpose.” The Appellate Division held: "The appellant had no obligation to do so. The elimination of slums, unsanitary and blighted areas is a public purpose. (N. Y. Const., art. XVIII; General Municipal Law, § 501; Kaskel v. Impelliteri, 306 N. Y. 73; Matter of Murray v. La Guardia, 180 Misc. 760, affd. 266 App. Div. 912, affd. 291 N.Y. 320, cert. den. 321 U. S. 771; Matter of New York City Housing Auth. v. Muller, 270 N. Y. 333.) Appropriate legislative bodies have been given legal authority to make the findings necessary for declaration of that public purpose.” Once the local authorities in whom the Constitution and the statute have lodged the power to determine an area "substandard and insanitary” shall "have made their finding, not corruptly or irrationally or baselessly,[2] there is nothing for the courts to do about it” (Kaskel v Impellitteri, 306 NY 73, 78, per Desmond, J., mot for rearg den 306 NY 609, cert den 347 US 934). As Judge Desmond then summed it up (p 80): "the situation here actually displayed is one of those as to which *767 the Legislature has authorized the city officials, including elected officials, to make a determination, and so the making thereof is simply an act of government, that is, an exercise of governmental power, legislative in fundamental character, which, whether wise or unwise, cannot be overhauled by the courts. If there were to be a trial here and the courts below should decide in favor of plaintiff, there would be effected a transfer of power from the appropriate public officials to the courts. The question is simply not a justiciable one.” The issues in the case at bar also reflect those discussed and decided in the comprehensive and well-considered opinion of Mr. Justice Wither, then at Special Term, in Matter of Fix v City of Rochester (50 Misc 2d 660, 665).
While giving lip service to the principles espoused in Kaskel (supra), respondents urge nevertheless that because their particular segment of the area determined to be substandard or otherwise appropriate for development is not, in their view, within the category, its inclusion was unlawful. It is too clear to require discussion, however, that — again as in Kaskel (supra, pp 79, 81) — "the test is as to the area as a unit, and not as to any one or more particular structures”. (And see Matter of Fix v City of Rochester, supra, p 664.) Although respondents’ property is a relatively minuscule segment of the 70-acre unit, the authorities could find that, by reason of its prominent State Street setting or key location or other factors, it was necessary to the project. Thus, it must be concluded that no basis appears for finding that the revised or amended project is of any less validity than the project as initially adopted. The same legislative standards and jurisdictional procedures employed to create the original project were applied to the formation of the accretion and hence underlie the whole, as the whole was thus newly constituted. It follows that the principles of legislative determination which govern the court’s examination of the original plan are no less applicable to the amended plan or project adopted with the same formality and pursuant to the same statutory prerequisites, and require the same conclusion.
Respondents’ remaining contentions are tenuous at best and require but brief comment.
It is asserted that the agency has not negotiated in good faith for the purchase of the property (cf. Condemnation Law, §4, subd 5); this on the ground that the agency did not increase its offer beyond $43,700. This claim seems to rest on *768 the assertions (1) that the agency paid $115,000 for the Ellis Building while offering $43,700 for respondents’ building; but there is no evidence whatsoever that the two structures are of comparable value and respondent Earl M. Bucci would not specifically deny (beyond asserting lack of recollection) that he had denied the agency’s appraiser access to the building; and (2) that after acquisition of the Ellis Building there remained an unexpended appropriation of $130,000; and this, too, seems irrelevant. The proof suggests no reason for the agency to pursue negotiations further, and particularly so when respondents’ contentions are considered as against the allegations of their answer that the true value of the property is $250,000, "which value increases daily”, and as against respondent Earl M. Bucci’s testimony that he told the agency that "the property was not for sale”.
Respondents contend that, because the Schenectady Urban Renewal Agency consists, as mandated by section 668 of the General Municipal Law, "of the members of the city council and mayor”, the agency is "illegally constituted in contravention of the statutory scheme of article 15-A of the General Municipal Law”. But article 15-A itself, which respondents cite as the "statutory scheme” here violated, in subdivision 4 of section 553 thereof provides that "[a]ny one or more of the members of an agency may be an official or employee of the municipality”; and, of course, the same Legislature that enacted article 15-A and subdivision 4 of section 553 thereof also enacted section 668 establishing the Schenectady Urban Renewal Agency and providing that its members shall be the Mayor and city council members.[3]
Respondents’ final contention is that in this case the planning commission’s vote was void because one of the members "should have disqualified himself’ (emphasis supplied); but there is no showing that the member was, in fact, disqualified to act or that any legal basis for his disqualification existed. The sole ground of respondents’ contention is that, at some time in the past, the member, Mr. Morsillo, a lawyer, represented a landowner client in a condemnation proceeding before a commission of which respondent Earl M. Bucci was *769 chairman; at which time Mr. Morsillo requested that Mr. Bucci not sit, stating, according to Mr. Bucci’s testimony, that there existed "a severe personality clash” between them; and, upon motion, the County Court removed Mr. Bucci accordingly. The quoted term — a product of cliché-ridden parlance and of equivocal meaning at best — is neither expanded upon nor explained in the context of the relationship between these two competing attorneys. It must be presumed that Mr. Morsillo performed his public duty honestly and in accordance with law (Matter of Driscoll v Troy Housing Auth., 6 NY2d 513, 518, mot for rearg den 7 NY2d 755), and in this case no evidence rebuts that presumption. Whether Mr. Morsillo was concerned lest some personal feeling might erupt to the prejudice of a well-conducted trial or that, for some other reason, it might be adverse to his client’s interest to try the case before Mr. Bucci, it does not follow that in this matter Mr. Morsillo, by reason of some "personality clash” or even personal dislike, would vote contrary to the public interest as he saw it. Finally, and importantly, Mr. Bucci was present at the meeting in question and despite his vociferous opposition to the proposed enlargement of the project and — as his brief puts it — his "strong remarks” concerning it, and despite his long experience as a lawyer, he did not challenge Mr. Morsillo’s qualification or request him to step down, at a time when the issue — if he really considered there was one — could have been promptly met and disposed of or preserved for subsequent judicial consideration.
Counsel have not addressed argument to the objections to evidence and motions to strike, as to which decision was reserved; and such motions are deemed denied. As it eventuated, the case did not turn on any objectionable proof, as should be clear from this decision.
Petitioner may submit judgment, in which the court will insert the names of qualified commissioners.

. The Ellis parcel, following the enlargement of the project, was acquired by petitioner by purchase and thus respondents’ parcel is, in effect, isolated — insofar as privately owned properties are concerned — as between the project property (formerly of Ellis) on the west and the remaining project property on the east; other project property — since redeveloped as the State-Erie Parking Lot — being on the north and State Street abutting on the south.

. The respondents pleaded fraud and corruption of local city and bank officers, subpoenaed the supposed participants and examined them at length. The record fails to raise even a suspicion of impropriety; and respondents’ briefs are silent as to these allegations of their defense.

. Were the Legislature’s wisdom or the theory and "scheme” of the statute questions for the court’s consideration, and most emphatically they are not, even so it would have to be held that the system of checks for which respondents contend is largely effectuated by interposition of the city planning commission, as an insulating layer perhaps, between the agency and the council.