EAST THIRTEENTH STREET COMMUNITY ASSOCIATION et al., Petitioners, v NEW YORK STATE URBAN DEVELOPMENT CORPORATION, Respondent.

First Department, April 8, 1993

### APPEARANCES OF COUNSEL

*Michael S. Gruen* of counsel, New York City *(David R. Gilliatt* and *Kevin J. Farrelly* with him on the brief; *Gruen & Livingston,* attorneys), for petitioners.

*John R. Casolaro* of counsel, New York City *(Joseph M. Ryan, Jack Kaplan, Lee A. Ohliger, A. David Hirsh* and *Jeffrey S. Boxer* with him on the brief; *Carter, Ledyard & Milburn,* attorneys), for respondent.

### OPINION OF THE COURT

ASCH, J.

In 1968, the City took title, by condemnation, to a lot measuring approximately 150 by 200 feet located between 13th and 14th Streets and Third and Fourth Avenues. The site now contains a parking lot and three vacant boarded-up buildings.

In 1991, H.E.L.P., a nonprofit sponsor of housing for homeless families, expressed interest in acquiring the lot to build a facility which would permanently house the homeless. Its proposed program provided for the construction of a 14-story building containing 96 apartments erected above an on-site community center on the 13th Street portion of the parcel. Forty-seven of the 96 apartments would be reserved for families of low income (earnings of less than $25,000 annually), and 49 apartments would be available to formerly homeless families, with preference given to those from the community. The development would also include a two-story commercial/retail structure constructed without charge by H.E.L.P. for the City.

To achieve these results, H.E.L.P., as project manager, organized the HHSC 13th Street Development Corporation (HHSC) to run the facility. Funds for the construction were to be furnished jointly by the City and State through the Housing Finance Agency of New York State (HFA) pursuant to article III-A of the Private Housing Finance Law. In addition to City and State funding, the developers expected Federal low-income housing tax credits to provide approximately $8,000,000 for operating reserves and for educational, day care and job training programs.

Because of the "red tape" associated with any municipal project and the normal attendant delay that could be expected, and also because HFA lacked the power of eminent domain which would cut through this bureaucratic red tape and delay, the New York State Urban Development Corporation (UDC) was enlisted as a participant.

On February 20, 1992, the UDC adopted a general project plan for the development and gave notice of a public hearing which was held in July. The public was provided with specific details of the development and comments were invited. Thereafter, the public was given an additional 30 days to make any further comments. After this period, in August of 1992, the UDC issued a determination and findings, based on the plan, the comments received, both pro and con, and "all other relevant documents".

Thereafter, petitioners who consist of local condominium boards, tenants and residents of nearby buildings brought this original proceeding pursuant to EDPL 207 which provides for review by the Appellate Division of the determination and findings of a condemnor.

The petitioners first assert that the proposed acquisition is not within the UDC's statutory jurisdiction or authority, since it is acting merely as an "expeditor" for HFA and is lending its override powers merely to facilitate evasion of local laws. In essence, petitioners are contending that respondent is "lending" its name and extraordinary powers to other parties who realistically have a primary stake and interest in the project greater than the UDC, and that this is outside the scope of the respondent's authority.

■ Even accepting this characterization of the respondent's role and activities in this project, does not dictate the conclusion that the UDC is acting in excess of its statutory jurisdiction and authority. As the respondent notes, the actions complained of are not only proper but precisely the sort of activity for which the UDC was created. In *Wein v Beame* (43 NY2d 326), a complex plan among the City, the UDC, a private developer and the bankrupt owner of the Commodore Hotel, was projected. It provided for the purchase of the hotel and its renovation by the developer, its sale to the UDC for a nominal sum and the subsequent lease-back of the hotel to the developer by the UDC for a 99-year period. Yet, the Court of Appeals held, *inter alia:* "[P]laintiff is, of course, presented with an insurmountable obstacle in the fact that the property will obtain tax exempt status not by any claimed or alleged invalid legislation enacted by the city council, but rather by virtue of the purchase of the hotel by the UDC. Plaintiff seeks to overcome this difficulty by characterizing the UDC as a 'straw man', with no real interest in or connection with the project, which has been brought into the plan solely as a means of providing a tax exemption which the city could not grant directly. Plaintiff's attempt to so easily avoid the inconvenient fact of UDC participation in the plan is of no avail. It is not for us to speculate as to the motive for the UDC's participation, nor to delineate the amount of active participation which is necessary to denominate a particular project a UDC project. Here, UDC will be the owner of the building, and it is enough that UDC has chosen to participate in a project which is designed to combat otherwise inevitable urban blight, and which is thus clearly in accordance with the benign purposes of the Legislature in creating UDC (see L 1968, ch 174, § 2)." *(Wein v Beame, supra,* at 331.)

The Legislature has expressly declared the statutory purpose: "to be the policy of the state to promote the safety, health, morals and welfare of the people of the state and to

promote the sound growth and development of our municipalities through the correction of such substandard, insanitary, blighted, deteriorated or deteriorating conditions, factors and characteristics by the clearance, replanning, reconstruction, redevelopment, rehabilitation, restoration or conservation of such areas, and * * *

"For these purposes, there should be created a corporate governmental agency to be known as the 'New York state urban development corporation' which, through issuance of bonds and notes to the private, investing public, *by encouraging maximum participation by the private sector of the economy, including the sale or lease of the corporation's interest in projects at the earliest time deemed feasible, and through participation in programs undertaken by the state, its agencies and subdivisions, and by municipalities and the federal government,* may provide or obtain the capital resources necessary to acquire, construct, reconstruct, rehabilitate or improve such industrial, manufacturing, commercial, educational, recreational and cultural facilities, and housing accommodations for persons and families of low income, and facilities incidental or appurtenant thereto, and to carry out the clearance, replanning, reconstruction and rehabilitation of such substandard and insanitary areas." (McKinney's Uncons Laws of NY, § 6252 [New York State Urban Development Corporation Act (UDC Act) § 2; L 1968, ch 174, § 1] [emphasis added].)

The petitioners assert that where the UDC acts under its "substandard and insanitary" area clearance powers, as it purports to do in this project, clearance must be its primary purpose, and no other purpose, including building for the homeless, will justify its involvement.

It is clearly evident from the holdings of the Court of Appeals *(see, e.g., Matter of Waybro Corp. v Board of Estimate,* 67 NY2d 349; *Wein v Beame, supra)* and the express language of the statute creating the respondent agency, cited in part above, that the UDC is not limited to projects in which it is the prime mover. There is no bar to the respondent taking part in projects where it plays an incidental but necessary role, as long as the clearance of blighted areas and reconstruction and rehabilitation remain the primary purpose of its participation. Thus, in *Yonkers Community Dev. Agency v Morris* (37 NY2d 478, *appeal dismissed* 423 US 1010), cited by petitioners in support of their position, the Court of Appeals held that once the land was found to be substandard, it would be no defense to its condemnation that the City had previ-

ously planned to turn over the land to a private company for the expansion of its facilities.

While the petitioners assert that the UDC's findings are jurisdictionally defective since the UDC did not "state the basis for its findings" (McKinney's Uncons Laws of NY, § 6260 [h] [UDC Act § 10, as amended]), the finding notes it is made "on the basis of the materials presented to this meeting, a copy of which is hereby ordered filed with the records of the Corporation". Accordingly, *Yonkers Community Dev. Agency v Morris (supra),* cited by petitioners, is not apposite. There, the Court did not find it necessary for the findings to be set forth in detail, but specifically noted that in that case, other than the agency's bare pleading of its "substandard" finding, the agency provided no further data as to the condition of the area except a "general statement" as to the number of substandard structures, and, indeed, found that "[n]o more can be found in the rest of the agency's supporting papers" *(supra,* at 484).

In contrast, in the case before us, the record amply supports the finding that the area is substandard and insanitary. The parcel is substantially undeveloped, consisting of a parking lot and containing three vacant boarded-up buildings. Eight more vacant boarded-up buildings stand just to the west of the parcel and there are yet others in the vicinity. The record also shows that the area had a high percentage of households receiving public assistance, 33% of the population aged 65 or under had incomes which fall below the poverty level and 586 of the total housing units were boarded up and unusable. While petitioners assert that the partial use of the parcel by a parking lot shows the land is not devoid of value, it is not the function of this Court to reexamine the determination and make its own independent findings but solely to ascertain if the agency has presented to the court "an adequate basis upon which it concluded that the land was substandard" and whether the opponents "then cannot show that the agency's determination is without foundation" *(supra,* at 486). Since there is no showing that the determination that a substantial part of the area is "substandard and insanitary" was made "corruptly or irrationally or baselessly, there is nothing for the courts to do about it" *(Kaskel v Impellitteri,* 306 NY 73, 78).

■ ■ The petitioners further assert that: "The UDC Act requirement that the project consist of a plan for reconstruction and rehabilitation as well as clearance of an area implic-

itly requires a finding that the project is financially feasible". They contend that the project entails an illegal use of funds to be diverted from the Permanent Housing for Homeless Families program (PHHF). However, the funding of office and community space in the residential building is within both the spirit and the express mandate of the Private Housing Finance Law governing such expenditures of PHHF monies. This office and community space is "incidental or appurtenant" to the housing, and therefore permitted (Private Housing Finance Law § 64 [5]). While the construction of the commercial building for the City, at no cost, would appear, at first blush, to be unconnected, the City will accept a nominal sum as consideration for the UDC condemnation. The construction of the building for the City is simply a delayed payment and, therefore, the Housing Finance Agency, charged with administering the PHHF funds, has adequate grounds for considering the erection of the commercial building as permissible land acquisition costs (see, Private Housing Finance Law § 64 [6]). The further contention by petitioners is that, even if tax credits are obtained, they will expire in about 15 years while H.E.L.P. is obligated to run the project for 35 years to comply with Private Housing Finance Law § 69 (1). However, while section 69 (1) provides for project owners of not-for-profit corporations to be "subject to such terms and conditions for a period of thirty-five years or such longer period as may be provided in the project description", there is no correlative requirement in the statute that the project owners must, at this initial stage, provide an exhaustive and completely detailed budget for 35 years covering all contingencies.

Further, as already noted, our review is limited. "This is not a de novo review, as petitioners suggest, either with respect to the public purpose issue, where review of the agency determination is circumscribed * * * or as to other issues, where courts reviewing compliance with statutory requirements should consider whether the agency's conclusion is supported by substantial evidence in the record that was before the agency at the time of its decision" (Matter of Jackson v New York State Urban Dev. Corp., 67 NY2d 400, 418).

■ Petitioners' next contention is that the exercise of respondent's override powers (see McKinney's Uncons Laws of NY, § 6266 [3] [UDC Act § 16 (3), as amended]), in its Resolutions of August 19, 1992, which specifically superceded New York City's Uniform Land Use Review Procedure (ULURP) was improper since the UDC was not the lead agency on the

project. However, as discussed above, the fact that the respondent is not the prime mover behind the project is of no moment, and the fact it is not the lead agency will not circumscribe its override powers.

"In sum, the 'override power' as it is sometimes referred to *(see, People v Miceli,* 73 Misc 2d 133, 140) in the UDC Act is not limited to regulatory provisions which would otherwise govern UDC's activity but encompasses as well the provisions which would otherwise govern the activity of a municipality contracting with UDC with respect to a redevelopment project, whether the municipality's cooperation is characterized as a participant, joint venturer or partner, and even though the city has a future vested interest and is expected to be the ultimate owner.

"Indeed we held as much, although in a different context, in *Wein v Beame* (43 NY2d 326)." *(Matter of Waybro Corp. v Board of Estimate, supra,* at 356-357.)

While the UDC does have the right to override local laws, the contention by the petitioners that various sections of the City Charter and the City's Zoning Resolution are treated by the proposed project as void is without merit. Thus, the prohibition against the sale of City-owned property, except at auction, is not overridden since the property is not being sold by the City but condemned by the UDC. Similarly, the requirement that "city facilities" be equitably distributed throughout the City is inapplicable since the facility will be constructed and operated by HHSC, not the City. Finally, the building is being erected "as of right" and there is, therefore, no necessity for an "override" of the Zoning Resolution.

▮ Petitioners also challenge the adequacy of the notice of sale of the property by the UDC to the nonprofit corporation on the ground that it allegedly failed to fix the price for the sale, detail the undertakings of the purchaser to operate the project and did not make assurances of the financial solvency of the project in both its construction and operational phases. McKinney's Unconsolidated Laws of NY § 6256 (1) (c) (UDC Act § 6 [1] [c]) provides that the UDC may sell or lease land use improvement projects, to any person or corporation, without public bidding or public sale when the UDC publishes a notice in at least one newspaper "which shall include a statement of the identity of the proposed purchaser or lessee and of his proposed use or reuse of the land * * * the price or rental to be paid * * * all other essential conditions of such

sale or lease, and a statement that a public hearing upon such sale or lease will be held". Such a notice was published by the respondent, identifying a H.E.L.P.-formed nonprofit corporation as the transferee, and reciting that the consideration was nominal. Further, there were no other "essential" conditions placed upon the sale by UDC to H.E.L.P.'s corporation HHSC. In any event, even if there had been some technical violation of the statutory requirements for notice, it would not affect the validity of the condemnation procedure, which is the only issue now before us.

Petitioners contend that the respondent's determination and findings were not made in accordance with the Eminent Domain Procedure Law, and that respondent did not comply with the requirements of ECL article 8 (State Environmental Quality Review Act [SEQRA]).

The Eminent Domain Procedure Law sets forth the original jurisdiction of the Appellate Division as to petitions challenging findings and determinations of a condemnor, subject to review by the Court of Appeals, "in the same manner and form and with the same effect as provided for appeals in a special proceeding" (EDPL 207 [B]). The same statute provides that:

"The court shall either confirm or reject the condemnor's determination and findings. The scope of review shall be limited to whether:

"(1) the proceeding was in conformity with the federal and state constitutions,

"(2) the proposed acquisition is within the condemnor's statutory jurisdiction or authority,

"(3) the condemnor's determination and findings were made in accordance with procedures set forth in this article and with article eight of the environmental conservation law, and

"(4) a public use, benefit or purpose will be served by the proposed acquisition." (EDPL 207 [C].)

The statute also sets out the factors which the respondent must discuss in its determination and findings. Thus, the condemnor shall specify

"(1) the public use, benefit or purpose to be served by the proposed public project;

"(2) the approximate location for the proposed public project and the reasons for the selection of that location;

"(3) the general effect of the proposed project on the environment and residents of the locality;

"(4) such other factors as it considers relevant" (EDPL 204 [B]).

The petitioners claim that the UDC in its determination and findings did not meet its obligation to consider the general effect of the project on residents of the locality and the general effect on the environment (EDPL 204 [B] [3]).

The findings and determinations are as follows:

## "I. The Public Use, Benefit and Purpose to be

## Served by the Project (EDPL Section 204 (B) (1))

"The purpose of the Project is to allow for the construction, operation and maintenance of affordable housing for homeless families and families at risk of becoming homeless. The Project will assist in addressing the serious shortage of decent affordable housing in New York City.

## "II. Project Location and Reasons for Selection

## of that Location (EDPL Section 204 (B) (2))

"The Project Area was selected for, among others, the following reasons: (1) the Project area to be acquired by eminent domain is owned by the City of New York (the 'City'), and the City is expected to consent to this condemnation for nominal consideration; (2) the Project and its construction will require no relocation because the New York State Housing Finance Agency ('HFA') and the City will remove the existing commercial tenant before UDC commences the condemnation proceeding to acquire the Project Area; (3) the topography of the site is flat and all utilities are readily available; (4) the Project Area is a blighted and substandard area in need of affordable housing for low income families; (5) the site is located near to existing public schools; (6) public transportation is available nearby; and (7) the site is located within walking distance of local shopping areas.

## "III. General Effect of the Project on the

## Environment and on the Residents of the Locality

## (EDPL Section 204 (B) (3))

"The Project will: (a) assist in alleviating the severe shortage of decent affordable low-income housing in New York

City; and (b) improve vacant and underutilized property with attractive new construction. HFA, serving as lead agency for review of the Project pursuant to the State Environmental Quality Review Act, has issued a negative declaration with respect to the Project.

"DETERMINATION

"Based on due consideration of the foregoing, it is determined that UDC should exercise its power of condemnation in order to implement the Project."

■ It can be seen from the foregoing that the respondent complied with the mandate of the statute (EDPL 204), setting forth the specifications required as to each relevant paragraph of EDPL 204 (B). Although concise, the statements, under headings taken from the language of the statute, as to "the public use, benefit or purpose to be served", the "location * * * and the reasons for the selection of that location" and "the general effect of the project on the environment and residents of the locality" were adequate and sufficient. Moreover, the respondent, which complied with the requirement of EDPL 204 to specify the general effect on the environment of the proposed project, had no duty under SEQRA to undertake its own environmental review, simply because it was the sole State agency involved with the power to condemn. The determination and findings correctly noted that HFA, as the project's "lead agency", had issued a "negative declaration" with respect to the environmental impact. As the designated lead agency, HFA was responsible for determining whether an environmental impact statement was required (6 NYCRR 617.2 [v]). It found that none was required and therefore made its negative declaration. UDC, as an involved agency (6 NYCRR 617.2 [t]) was entitled to rely upon that determination of HFA. *Matter of Coca-Cola Bottling Co. v Board of Estimate* (72 NY2d 674), cited by petitioners, is not apposite. In that case, the Court of Appeals merely found that the City had improperly designated the Department of Environmental Protection as the lead agency, since the only responsibility it had in connection with that project was the performance of the environmental review. HFA, to the contrary, has been closely involved with the financial and other aspects of the project herein.

■ Respondent asserts that this project is exempt from the requirements set by SEQRA, but this is not the case. Previ-

ously, objections relating to environmental issues, which arose in a condemnation proceeding pursuant to EDPL 207, could not take place in that proceeding but had to be raised in a separate CPLR article 78 proceeding *(see, Pizzuti v Metropolitan Tr. Auth.,* 67 NY2d 1039). However, the Legislature amended EDPL 207 (C) (3), effective July 15, 1991, to permit review by this Court of whether the condemnor's determination was made in conformity with ECL article 8.

The respondent asserts that this project is, nevertheless, exempt from the requirements of SEQRA because of the emergency need in New York City for housing for the poor and homeless. It cites the implementing regulations of SEQRA which specifically exempt from the normal review process, "emergency actions which are immediately necessary on a limited and temporary basis for the protection or preservation of life, health, property or natural resources, provided that such actions are directly related to the emergency and are performed to cause the least change or disturbance, practicable under the circumstances, to the environment" (6 NYCRR 617.2 [q] [4]). While there can be no dispute that there is an "emergency" with respect to housing for the homeless, the project herein does not qualify as one necessary on a "limited and temporary basis" within the meaning of the implementing regulations. *Matter of Board of Visitors—Marcy Psychiatric Ctr. v Coughlin* (60 NY2d 14), *Spring-Gar Community Civic Assn. v Homes for the Homeless* (149 AD2d 581) and *Matter of Silver v Koch* (137 AD2d 467), are all inapposite. Those cases involved the conversion of an unused minor portion of a mental institution into a correctional facility *(Marcy),* the housing of homeless families at an existing shelter in Queens County *(Spring-Gar)* and the use of a prison barge moored at a City pier to house excess prisoners *(Silver).* In none of the cases was construction of a permanent structure contemplated. The construction of a 14-story housing project can hardly be said to fall into the category of an action taken on a "limited and temporary basis".

Accordingly, we must review whether the HFA as lead agency satisfied the mandate of SEQRA. In doing so, we note that: "The limited issue presented for our review is whether the respondents identified the relevant areas of environmental concern, took a 'hard look' at them and made a 'reasoned elaboration' of the basis for their determination [citations omitted]" *(Chinese Staff & Workers Assn. v City of New York,* 68 NY2d 359, 363-364).

■ The "negative declaration" by HFA that the project will not have a significant adverse effect on the environment is adequately supported in the record submitted herein. HFA described the project with photographs of the site; attached a letter from the State Office of Parks, Recreation and Historic Preservation that the project would have "No Impact" on cultural resources and historic places nearby (i.e., the famous Luchow's Restaurant, now closed, is adjacent to the lot, as is the still active nightclub, the Palladium). An environmental audit dated August 3, 1992, prepared by Ecosystems Strategies Inc., indicated, *inter alia*, no evidence of existing soil contamination, hazardous waste or chemical spills. While this report indicated the presence of asbestos-containing material in the plaster and roofing, it was not considered material in posing any danger. An Environmental Assessment Form prepared by H.E.L.P., dated June 12, 1992, failed to uncover any adverse environmental effects at the site or surrounding area except to note that the 96 newly constructed apartments would increase the demand for recreation, police, education and fire prevention services. This report also indicated that the project enjoyed the support of the Mayor, City Council, Borough President and had the support of Community Boards Nos. 3 and 6 (unanimously in the case of Board No. 3 where the project will be located).

The respondent notes that since we are reviewing the SEQRA determination in a proceeding pursuant to the recently amended EDPL 207 (C) (3), the standard of review pursuant to that statute would be whether the determination was made "corruptly or irrationally or baselessly" *(Kaskel v. Impellitteri, supra,* at 78). However, respondent points out that the article 78 standard of review used in SEQRA determinations is "whether a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion" (CPLR 7803 [3]). While respondent asserts it is not "clear" whether this Court should apply the article 78 or the EDPL 207 standard of review, we do not find that the standard differs substantially with the two types of proceedings. In any event, under *both* standards, the petitioners have failed to meet their burden of proof and the HFA's SEQRA determination is amply supported by the record. The HFA, as lead agency, identified the relevant areas of environmental concern, took a "hard look" at them and made a " 'reasoned elaboration' " of the basis for its determination *(Chinese Staff & Workers Assn.*

*v City of New York, supra,* at 363). Accordingly, the determination was not arbitrary or capricious, or corrupt, baseless or irrational, and complies with the statutory mandate (ECL art 8).

■ Finally, petitioners claim that the UDC Act unconstitutionally delegates legislative authority to the respondent by allowing it to use its condemnation power to "cut through" not only the "red tape" of petty bureaucratic meddling or inaction but also basic democratic processes and controls. However, these arguments have previously been raised and rejected *(see, Matter of Waybro Corp. v Board of Estimate, supra; Floyd v New York State Urban Dev. Corp.,* 33 NY2d 1). As noted by the Court of Appeals: "Actually, UDC's powers stem from the State Constitution itself, article XVIII of which establishes the legislative power to create such an agency in order to alleviate the housing problem·throughout the State in the interests of general health, safety and welfare; and hence, there is no constitutional infirmity in either the creation of UDC or its right to override local zoning laws." *(Floyd v New York State Urban Dev. Corp., supra,* at 7.)

Accordingly, the determination and findings of the respondent UDC is confirmed, on the law and facts, pursuant to EDPL 207 (C), and the petition dismissed, without costs or disbursements.

Motion to add respondent and amend caption denied.

MURPHY, P. J., CARRO, ROSENBERGER and ROSS, JJ., concur.

Proceeding brought by petitioners pursuant to EDPL 207 to review determinations and findings of respondent dated August 19, 1992, confirmed, on the law and the facts, and the petition dismissed, without costs or disbursements.