(February 26, 2009)

■ In the Matter of DEVELOP DON'T DESTROY (BROOKLYN) et al., Appellants, v URBAN DEVELOPMENT CORPORATION, Doing Business as EMPIRE STATE DEVELOPMENT CORPORATION, et al., Respondents. [874 NYS2d 414]—

Order and judgment (one paper), Supreme Court, New York County (Joan A. Madden, J.), entered January 17, 2008, inter alia, dismissing the action challenging various administrative findings concerning the Atlantic Yards Arena Redevelopment Project, affirmed, without costs.

Respondent Forest City Ratner Companies (FCRC) has proposed to construct a vast and purportedly transformational

mixed-use development on a 22-acre swath of real estate in Brooklyn extending eastward from the junction of Atlantic and Flatbush Avenues. "Atlantic Yards," as the project is called by reason of its planned situation atop of and in blocks adjacent to the rail yards serving the Long Island Rail Road (LIRR) Atlantic Terminal, is to include 16 high rise structures and a sports arena. Six thousand, four hundred thirty housing units, more than a third of which will be "affordable," are to be accommodated in the project's towers along with hundreds of thousands of square feet of space dedicated to commercial purposes. Also to be included within the project footprint is an 18,000-seat arena, intended to serve, inter alia, as the new home of the Nets, the National Basketball Association franchise now situated in New Jersey, which would, upon its move to the new arena, become Brooklyn's first major professional sports team since the Dodgers left the borough for Los Angeles in 1957. The proposed arena's design is by the eminent American architect, Frank Gehry, and the eight acres of open space to be situated amid the arena and the project's other structures are to be laid out according to the plans of the highly regarded landscape architect, Laurie Olin. Other promised benefits of the project include improved access to the major transit hub already located at its site and construction of a new, covered LIRR rail yard.

The project has been shepherded through its preconstruction phases and otherwise promoted by respondent New York State Urban Development Corporation, doing business as the Empire State Development Corporation (ESDC). In addition to acting as the "lead agency" in connection with the project's environmental review (*see generally* 6 NYCRR 617.2 [u]), the ESDC has obtained authorization from the State Legislature and respondent New York State Public Authorities Control Board (PACB) to finance a portion of the project through a bond issue. It has also made certain findings simultaneously placing the project within its purview and exempting it from compliance with otherwise applicable city zoning and land use laws (*see* McKinney's Uncons Laws of NY § 6266 [3] [Urban Development Corporation Act (UDCA) § 16 (3), as added by L 1968, ch 174, § 1, as amended]), namely, that the project qualifies as a "land use improvement project" pursuant to Unconsolidated Laws § 6260 (c) and § 6253 (6) (c) (UDCA § 10 [c]; § 3 [6] [c]), based upon blight at its site, and that the project's proposed arena qualifies under Unconsolidated Laws § 6260 (d) and § 6253 (6) (d) as a "civic project." Also, in collateral proceedings the ESDC has exercised its condemnation power (*see* Uncons Laws § 6255 [7] [UDCA § 5 (7)]) on the project's behalf (*see Matter of*

*Anderson v New York State Urban Dev. Corp.*, 45 AD3d 583 [2007], *lv denied* 10 NY3d 710 [2008]) and has defended that exercise against constitutional challenge (*see Goldstein v Pataki*, 516 F3d 50 [2008], *cert denied* 554 US —, 128 S Ct 2964 [2008]).

The project footprint extends over eight city blocks, the majority of which are now occupied by subgrade rail yards lying within an area that has, since 1968, been designated the Atlantic Terminal Urban Renewal Area (ATURA). There is no dispute that this previously designated area is in fact blighted and that the proposed development, insofar as it affects this area, has been properly deemed a "land use improvement project." Adjoining the rail cut on its southern side, however, lie two full blocks and part of a third that are not within ATURA but are within the FCRC project footprint. These non-ATURA project blocks, although never previously earmarked for urban renewal, have, since the announcement of the project, been found blighted by the ESDC and thus proper for development under the ESDC's auspices, along with the contiguous rail yard blocks, as a "land use improvement project."

While the principal focus of this appeal would appear to be upon the propriety of the ESDC's UDCA findings that the non-ATURA project blocks are blighted and that the proposed arena qualifies as a "civic project," petitioners in this hybrid CPLR article 78/declaratory judgment action have also raised numerous challenges to the adequacy of respondents' compliance with the State Environmental Quality Review Act (SEQRA), several of which survive for our review. Petitioners urge (1) that the PACB determination approving the ESDC's financial participation in the project was improper in the absence of environmental findings by the PACB; (2) that the ESDC's environmental review was deficient due to its failure to address the risk of a terrorist attack upon the project; (3) that the "build years" used by the ESDC in its environmental impact statement (EIS) were irrational and skewed the ensuing analysis of the project's environmental effects; and (4) that because the ESDC failed to study and give due consideration to real estate market trends in the non-ATURA project area, it could not have adequately discharged its statutory obligation to consider alternatives to the proposed project not involving that area's development as part of an urban renewal project. We address these SEQRA claims first and then turn to the claims arising under the UDCA.

Ordinarily, under SEQRA an involved agency must, when exercising discretion to approve an action for which an EIS is required, make certain statutorily enumerated environmental findings based on the EIS (*see* ECL 8-0109 [8]; 6 NYCRR 617.11

[d]). This requirement, however, is logically premised upon the relevance of the EIS to the decision the agency is called upon to make. Accordingly, where the decision, although discretionary, is governed by criteria unrelated to the environmental concerns addressed in an EIS, environmental findings based on the EIS are unnecessary as it would be pointless to mandate reliance on an EIS in the interest of informed decision-making in circumstances where the EIS is by hypothesis irrelevant to and cannot inform the decision to be made (*see Incorporated Vil. of Atl. Beach v Gavalas*, 81 NY2d 322, 326 [1993]). Here, the PACB's approval of the ESDC's financial participation in the project was governed by closely drawn statutory criteria specifically relevant to a distinct, statutorily prescribed inquiry, i.e., whether "there [were] commitments of funds sufficient to finance the acquisition and construction" of the project (Public Authorities Law § 51 [3]). Plainly, this singular, discrete financial inquiry would not have been usefully informed by the EIS's account of the project's environmental effect and, accordingly, did not trigger an obligation to make environmental findings pursuant to ECL 8-0109 (8).

Petitioners' remaining SEQRA claims allege substantive deficiencies in the project's EIS. However, our power to review the substantive adequacy of an EIS is extremely limited. It is by now a familiar refrain that we may not disturb an agency determination as substantively flawed unless it is affected by an error of law, arbitrary and capricious, or constitutes an abuse of discretion (*see* CPLR 7803 [3]; *Akpan v Koch*, 75 NY2d 561, 570 [1990]; *Matter of Jackson v New York State Urban Dev. Corp.*, 67 NY2d 400, 416 [1986]), and, in the context of reviewing a lead agency's SEQRA determination, this generally expressed limitation has been understood to confine judicial inquiry to a "review [of] the record to determine whether the agency identified the relevant areas of environmental concern, took a hard look at them, and made a reasoned elaboration of the basis for its determination" (*id.* at 417 [internal quotation marks and citations omitted]). In assessing whether an agency has met its substantive SEQRA obligations, the appropriate judicial focus is not upon the agency's ultimate judgments but upon the deliberative process by which they were reached, and the touchstone is reasonableness. "Not every conceivable environmental impact, mitigating measure or alternative must be identified and addressed before a FEIS will satisfy the substantive requirements of SEQRA. The degree of detail with which each factor must be discussed obviously will vary with the circumstances and nature of the proposal" (*Jackson*, 67 NY2d at 417 [internal quotation marks and citations omitted]).

While the 3,500-page final EIS approved by the ESDC in connection with the proposed project provides impressively detailed analyses of the project's anticipated environmental impacts in 16 separately identified areas, petitioners contend that it fails to identify and take a "hard look" at a relevant area of environmental concern because it does not address the risk of a terrorist incident at the project site. But SEQRA contains no provision expressly requiring an EIS to address the risk of terrorism and, indeed, it would not appear that terrorism may ordinarily be viewed as an "environmental impact *of* [a] proposed action" (ECL 8-0109 [2] [b] [emphasis added]) within the statute's purview. We do not, however, find it necessary to determine whether consideration of the prospect of terrorism may ever lie within the scope of the environmental review mandated by the statute, and leave open the possibility that there may be a case in which a proposed action will by its very nature present a significantly elevated risk of terrorism and consequent environmental detriment, i.e., a case in which the risk and its potential adverse environmental impacts may in a real sense be said to stem from the action itself rather than an independent ambient source (*see e.g. San Luis Obispo Mothers for Peace v Nuclear Regulatory Commn.*, 449 F3d 1016 [2006], *cert denied* 549 US 1166 [2007]). For now, it suffices to observe that the project at issue does not pose extraordinary inherent risks; it does not involve the siting of a nuclear storage facility (*id.*), or a biological weapons laboratory (*Tri-Valley Cares v Department of Energy*, 203 Fed Appx 105, 107 [2006]), or any comparably risk-elevating action, but rather the creation of a venue dedicated to routine residential, commercial and recreational purposes (*see* 6 NYCRR 617.9 [b] [6]). These latter purposes, even when realized in the form of a major urban development situated at a preexisting transit hub, do not so clearly increase the risk of terrorism, much less of terror-induced environmental harm, as to render the lead agency's determination not to address terrorism as an environmental impact *of* the proposed action unreasonable as a matter of law.

To be sure, tragic experience counsels that even venues designed to accommodate relatively benign uses may become terrorist targets and that security must be a concern in the planning of any public project, particularly one concentrating large numbers of people. We have recently affirmed the obligation of landlords, under tort law, to take reasonable measures to secure their premises against actual reasonably foreseeable risks of terrorist predation (*see Nash v Port Auth. of N.Y. & N.J.*, 51 AD3d 337 [2008]). At issue here, however, is not the extent of a landlord's common-law security obligation, but the scope of the

lead agency's statutory planning obligation publicly to identify the significant environmental impacts of a proposed action, and, ordinarily, terrorism does not fall under that latter rubric.

Turning now to the "build year" issue, it is petitioners' contention that the build years, i.e., the time periods by which the phases of the project were predicted to be substantially operational, were intentionally underestimated in the project EIS and that the EIS's disclosure of the project's environmental impacts was consequently fatally skewed. The record, however, discloses that in selecting the build years to be used in the EIS, the lead agency did not arbitrarily select a build year it found favorable but relied upon the detailed construction schedules of the project's highly experienced general contractor and upon the opinions of its own consultants and an independent contractor. It is, of course, possible that the lengths of the projected build-out periods (four years for the first phase of the project, including the arena, and 10 years for the remaining elements) were underestimated, but the ultimate accuracy of the estimates is neither within our competence to judge nor dispositive of the issue properly before us, which is simply whether the lead agency's selection of build dates based on its independent review of the extensive construction scheduling data obtained from the project contractor may be deemed irrational or arbitrary and capricious (*see Akpan*, 75 NY2d at 572-573), and it may not. The build dates having been rationally selected, there can be no viable legal claim that the EIS was vitiated simply by their use. Indeed, we have, in rejecting a similar challenge to an EIS, held that reliance on a particular build date, even if inaccurate, will not affect the validity of the basic data utilized in an EIS (*Matter of Committee to Preserve Brighton Beach & Manhattan Beach v Council of City of N.Y.*, 214 AD2d 335, 337 [1995], *lv denied* 87 NY2d 802 [1995]).

Petitioners' final appellate claim of substantive inadequacy in the EIS focuses upon the EIS's consideration of alternatives to the proposed action. Petitioners do not contend that the lead agency wholly failed to discharge its statutory obligation to consider feasible alternatives to the FCRC project (*see* ECL 8-0109 [2] [d]), for the EIS in fact contains a separately headed, highly detailed 83-page section discussing various alternatives, including one involving no action and another contemplating a lower density, arenaless development not encompassing the non-ATURA project blocks. Petitioners' contention is rather that the lead agency did not take into account in the EIS prevailing real estate trends, particularly as they affected and had become manifest in the non-ATURA project area at the time of the

project's announcement, and thus could not have reasonably concluded that the proposed project was to be preferred to its alternatives for its purportedly unique capacity to alleviate blight in the non-ATURA blocks. This argument, however, necessarily supposes that the lead agency's judgment as to the relative desirability of the proposed project must have turned upon the project's purported efficacy as a means of improving the non-ATURA blocks. It is, however, clear from the EIS that the lead agency's rationale for preferring the proposed project was not so singularly grounded. The proposed project, in distinction to the alternatives preferred by petitioners, included an architecturally distinguished arena that would house a major professional sports franchise, an elaborate new subway entrance, a new and improved LIRR rail yard, improved pedestrian and bicycle linkages connecting the project and the surrounding neighborhoods on the north-south axis, an on-site stormwater drainage system, and eight acres of open space landscaped by Laurie Olin. It also made provision for significantly more affordable housing than would have been developed under alternative scenarios, and, by reason of its scale and range of uses, promised economic and fiscal benefits exceeding those expected to be generated under the other plans. To be sure, as the EIS discloses, there were more adverse impacts associated with the proposed project than with its less ambitious alternatives, but, on balance, there is no tenable argument that the lead agency's preference for the FCRC project, arrived at after an evidently conscientious weighing of alternatives, was not rationally and sufficiently based on the project's distinctive constellation of otherwise unattainable benefits. Certainly, the lead agency did not in this case exceed the "considerable latitude" afforded it under SEQRA to evaluate environmental effects and choose among alternatives (*Jackson*, 67 NY2d at 417).

Petitioners also challenge the designation of the non-ATURA project area as a UDCA "land use improvement project" on the ground that gentrification of the area had progressed appreciably due to market forces and would have run its course if permitted to do so. In this context, however, the thrust of the argument is not that a feasible alternative to the proposed action was unreasonably rejected by the ESDC, but more fundamentally that the ESDC had no legitimate role to play with respect to the blocks in question since they are not in fact "substandard and insanitary" and accordingly not a proper subject of an ESDC sponsored "plan or undertaking for the[ir] clearance, replanning, reconstruction and rehabilitation" (Uncons Laws § 6253 [6] [c]).

Before considering this issue and petitioners' challenge to the

other proffered justification for the ESDC's sponsorship of proposed project, i.e., that it is a "civic project" within the meaning of Unconsolidated Laws § 6253 (6) (d), we note that the constitutional sufficiency of the public purposes upon which the ESDC's involvement in the Atlantic Yards project as a condemnor was predicated has been the subject of now completed litigation. In *Goldstein v Pataki* (516 F3d 50 [2008], *supra*), the Second Circuit Court of Appeals held that the ESDC's exercise of its eminent domain power to take private property for the project, and specifically to take private property within the non-ATURA project blocks, was supported by the project's rational relation to "several classic public uses whose objective basis is not in doubt" (*id.* at 63). Among these "classic public uses" were the alleviation of blight in both the ATURA and non-ATURA project areas and the provision of a sporting arena (*id.* at 55, 58-59, 62). In rejecting the plaintiffs' claim that these purposes were under the specific circumstances presented inadequate to support the ESDC's exercise of its eminent domain power, indeed that they amounted to no more than pretexts for bestowing a private benefit upon FCRC, the court, citing numerous authorities, but most notably *Berman v Parker* (348 US 26 [1954]) and *Hawaii Housing Authority v Midkiff* (467 US 229 [1984]), emphasized that it is an essentially legislative, and not a judicial function to define the public agenda, and, accordingly, that in all but the most extraordinary cases—those in which there is no conceivable public purpose to be served—courts reviewing the adequacy of a use advanced in support of an exercise of the eminent domain power are bound to defer to the public purpose findings of the Legislature and its agencies (*Goldstein*, 516 F3d at 57-60). In this last connection, the court specifically rejected the contention that the findings of the ESDC were, by reason of its status as a public benefit corporation, nonlegislative and thus undeserving of deference, holding instead that, in making the findings upon which its exercise of the takings power was to rest, most particularly those contained in its blight study, the ESDC acted as an agent of the Legislature (*id.* at 60). In any case, it was, according to the court, undisputed that over half the project area was in fact blighted, and that there was significant blight in the takings area (i.e., the non-ATURA project area) amid which the plaintiffs' properties were situated. That the plaintiffs' properties were not themselves blighted did not require alteration of the project footprint since "community redevelopment programs need not, by force of the Constitution, be on a piecemeal basis—lot by lot, building by building" (*id.*, quoting *Rosenthal & Rosenthal Inc. v New York State Urban Dev. Corp.*, 771 F2d 44,

46 [1985], *cert denied* 475 US 1018 [1986], quoting *Berman*, 348 US at 35), and "[o]nce it has been shown that the surrounding area is blighted, the state may condemn unblighted parcels as part of an overall plan to improve a blighted area" (*id.*, quoting *In re G. & A. Books, Inc.*, 770 F2d 288, 297 [2d Cir 1985]).

While petitioners' challenges to the ESDC's findings authorizing the project as one for the public purposes of land use improvement (Uncons Laws § 6260 [c]) and the provision of civic facilities (§ 6260 [d]) are not legally precluded by *Goldstein*, post-*Goldstein* petitioners are reduced to arguing that although the uses of the project are sufficiently public to support a justly compensated taking of property within the project footprint by the ESDC through its power of eminent domain, the identical uses will not support redevelopment of the very same property pursuant to the UDCA. This posited, evidently anomalous disparity finds no support in the cases, which, as a matter of basic constitutional design, counsel extreme judicial circumspection in assessing the adequacy of the public purposes advanced by the Legislature and its agencies in support of government actions falling, even arguably, within the state's police power. As Justice Douglas wrote in *Berman*, "[t]he definition [of the police power] is essentially the product of legislative determinations addressed to the purposes of government . . . Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive" (348 US at 32). This admonition has been strictly followed and nowhere more so than in cases where the purpose advanced for the proposed governmental action is, as it was in *Berman* and is here, that of alleviating or preventing "substandard and insanitary" conditions, or "blight."

These terms, whose potentially capacious reference has not been meaningfully reduced by statutory definition (*see e.g.* Uncons Laws § 6253 [12]), are to be understood "liberally" so as not to unduly constrict the governmental prerogative to take measures directed at improving the urban environment (*see Yonkers Community Dev. Agency v Morris*, 37 NY2d 478, 481-484 [1975]). This definitional check upon judicial revision of determinations substantially and appropriately committed to the policy-making branches of government is complemented and reinforced by a standard of review that may with great understatement be described as lenient: "[W]hen [the agencies to which the initial blight determination has been committed] have made their finding, not corruptly or irrationally or baselessly, there is nothing for the courts to do about it, unless every act and decision of other departments of government is subject

to revision by the courts" (*Kaskel v Impellitteri*, 306 NY 73, 78 [1953], *cert denied* 347 US 934 [1954]).

Contrary to petitioners' argument, there exists no ground to suppose that this standard, compelling deference to agency blight findings when they are not utterly without rational basis, is applicable only in the context of evaluating whether there is a sufficient public use to support condemnation. Condemnation is not an end in itself, but merely an instrument for the achievement of a social purpose, here urban redevelopment (*see Berman*, 348 US at 33; *Rosenthal & Rosenthal Inc. v New York State Urban Dev. Corp.*, 771 F2d 44, 46 [1985]). Courts, even in the condemnation context, have understood that the issue before them in determining whether property was blighted was not simply whether it could be condemned and cleared but ultimately whether by reason of blight it "qualifie[d] for renewal" (*Yonkers Community Dev. Agency*, 37 NY2d at 484; *and see Kaskel*, 306 NY at 79 [framing the inquiry in the condemnation proceeding as whether the property at issue was "so substandard or insanitary, or both, as to justify *clearance and redevelopment* under the law" (emphasis added)]). The essential purpose of the blight finding in connection with condemnation, i.e., to qualify property for urban renewal, is not different under the ESDC's enabling statute (Uncons Laws § 6260), and, accordingly, the adequacy of blight findings in the two contexts should not be judged by different standards. What is fundamentally at issue in both contexts is the extent of the government's unitary power to define, and act in pursuance of a public purpose. It makes no difference that the agency through which the government has here acted, the ESDC, is organized as a public benefit corporation. It is nonetheless a "governmental agency of the state, constituting a political subdivision [thereof]" (Uncons Laws § 6254 [1] [UDCA § 4 (1)]) and, as such, its public purpose findings within the scope of its legislative authorization are entitled to extraordinary judicial deference (*see Kaskel*, 306 NY at 78-80; *and see Goldstein*, 516 F3d at 60; *Jackson*, 67 NY2d at 424-425; *Matter of West 41st St. Realty v New York State Urban Dev. Corp.*, 298 AD2d 1, 6-7 [2002], *appeal dismissed* 98 NY2d 727 [2002], *cert denied* 537 US 1191 [2003]; *East Thirteenth St. Community Assn. v New York State Urban Dev. Corp.*, 189 AD2d 352, 359 [1993], *affd* 84 NY2d 287 [1994]). We have, of course, employed this deferential standard, not only in the condemnation context, but also in reviewing blight findings made by the ESDC pursuant to Unconsolidated Laws § 6260 (c) (*see Tribeca Community Assn. v New York State Urban Dev. Corp.*, 200 AD2d 536, 537 [1994], *lv denied* 84 NY2d 805 [1994]), and in judging the adequacy of the blight predicate for an urban renewal

designation pursuant to article 15 of the General Municipal Law (*see Jo & Wo Realty Corp. v City of New York*, 157 AD2d 205, 217-218 [1990], *affd on other grounds* 76 NY2d 962 [1990]).

Petitioners naturally seek to bring their claims within the very narrow circumstances hypothetically reserved by *Kaskel* for judicial scrutiny, i.e., where an area's physical condition "might be such that it would be irrational and baseless to call it substandard or insanitary" (306 NY at 80). However, the facts are very much against them. Indeed, this case is in significant respects very much like *Kaskel*, in which blight findings were upheld for an area including the part of Columbus Circle upon which the Coliseum was to be erected. Like petitioners, Kaskel maintained that the proposed development encompassed areas which, although contiguous, were of distinctly different character, one displaying indicia of blight and the other, the area on Columbus Circle, being relatively free of such conditions (*id.* at 82-83 [Van Voorhis, J., dissenting]). Also, similar to the argument petitioners now make, Kaskel maintained that the allegedly distinct, nonblighted Columbus Circle area had been made part of the proposed urban renewal project area, not because it was blighted but because it was coveted by the developer as a site for the Coliseum, which the developer wished for financial reasons to erect as an element of an urban renewal project. The Court rejected this argument with language dispositive of petitioners' present contentions as to the propriety of the ESDC's blight finding respecting the non-ATURA project blocks: "There is no real question of fact here since the details as to age, condition and present use of the properties involved are undisputed and indisputable, as shown by the exhibits. Plaintiff does not dispute with defendants as to the condition of these properties or of the whole area. He is simply opposing his opinion and his judgment to that of public officials, on a matter which must necessarily be one of opinion or judgment, that is, as to whether a specified area is so substandard or insanitary, or both, as to justify clearance and redevelopment under the law. It is not seriously contended by anyone that, for an area to be subject to those laws, every single building therein must be below civilized standards. The statute (and the Constitution), like other similar laws, contemplates that clearing and redevelopment will be of an entire area, not of a separate parcel, and, surely, such statutes would not be very useful if limited to areas where every single building is substandard. A glance at the photographs, attached to the city's affidavit on these motions, shows that a considerable number of buildings in this area are, on a mere external inspection, below modern standards because of their age, obsolescence and decay. The other exhibits confirm

this. Therefore, the question here is not whether certain public officials have acted arbitrarily or unwisely in coming to a certain conclusion. Here we have a naked question of legality, that is, of power, and the particular power to make a determination on this matter of judgment has been conferred by statute on these defendants" (*id.* at 79-80). Here too there is no real issue as to the actual condition of the properties at issue or of the whole area; it is conceded that over half the project area is blighted within the meaning of the statute and, although petitioners dispute whether the non-ATURA area may be characterized as blighted, the existence of circumstances indicative of "substandard and insanitary" conditions in that area is extensively documented, photographically and otherwise, in the ESDC's lot-by-lot blight study. While it is possible to disagree with the agency's conclusion that the area at issue is blighted, and to argue that the blight designation is not warranted by the area's character and potential, on this record, all that is involved is a difference of opinion. In such a case, it does not matter whether we would be inclined to agree with petitioners; we are bound to defer to the agency to which the determination has been legislatively committed. This is not the "conceivable" case hypothesized by *Kaskel* in which the area in question so absolutely defies description as "substandard and insanitary" as to render a blight designation susceptible of characterization as irrational or baseless, and thus vulnerable to judicial disturbance. Rather, this presents "a naked question of legality" that must be resolved in respondent agency's favor. The issue posed is not which of the parties has more persuasively characterized the area in question, but whether there was any basis at all for the exercise by the agency of the legislatively conferred power to make a blight finding, and plainly there was.

In the many years since *Kaskel*, agency blight findings have been found deficient in this state only where they were utterly unsupported (*see e.g. Yonkers Community Dev. Agency*, 37 NY2d at 484), and there has been no case in which the condition of an area has been deemed sufficiently at odds with an agency blight finding to raise a factual issue as to whether the agency exceeded its authority in making the finding. This is not because the limits of the blight concept have been untested. Indeed, if ever a claim of blight challenged one's commonsense understanding of the term it was in *Jo & Wo Realty Corp. v City of New York* (157 AD2d 205 [1990], *supra*) in which the City urged that the Coliseum site at Columbus Circle (now the location of the Time Warner Building)—undoubtedly, even at the time of the litigation, one of the most valuable pieces of real estate in the City, bordering upon the very exclusive southwestern corner

of Central Park—was blighted and thus appropriate for designation as an urban renewal site. This Court, however, citing *Kaskel*, and accepting the City's contention that the site was outmoded, underbuilt and insufficiently utilized, found the proposed designation proper (*Jo & Wo Realty Corp.* at 218) notwithstanding the site's obvious, indisputable potential for private development. The point to be made is that "blight" has proved over time to be a highly malleable and elastic concept capable of enormously diverse application. This is not in the main attributable to the ingenuity of consultants eager to please the developers who pay their bills, but because the concept, within the field of its likely use, is more facilitative than limiting.

Petitioners' final contention is that the ESDC was without power to authorize the project as a "civic project" pursuant to Unconsolidated Laws § 6260 (d) based on FCRC's proposed construction of a professional sports arena within the project footprint. As is here relevant, the statute conditions civic project designation upon findings that there is a need in the area in which the project is located for a recreational facility (§ 6260 [d] [1]), i.e., that there is a public purpose for the proposed facility, and that the need will be met by "a building . . . for . . . recreational . . . or other civic purposes" (§ 6260 [d] [2]). Although it is now conceded that the proposed arena will serve a recreational purpose, petitioners urge that the purpose is not sufficiently civic to justify the arena's designation as a "civic project." Here, petitioners emphasize that the arena will be leased on a long-term basis, and provide financial benefit to private parties. However, it is established that a sports arena, even one privately operated for profit, may serve a public purpose (*Murphy v Erie County*, 28 NY2d 80 [1971]), and, in any event, the agency findings to the effect that the proposed arena will serve a public purpose by providing a needed recreational venue in the area of the project are for reasons already discussed largely beyond our review; they are neither irrational nor baseless. We perceive no support for petitioners' contentions that the agency was not permitted under its enabling legislation to authorize construction of the proposed arena as a "civic project," or that such a project could be authorized only by a separate act of the Legislature. The plain language of the existing enabling enactment authorized the agency to do as it did.

While we do not agree with petitioners' legal arguments, we understand those arguments to be made largely as proxies for very legitimate concerns as to the effect of a project of such

scale upon the face and social fabric of the area in which it is to be put. Those concerns, however, have relatively little to do with the project's legality and nearly everything to do with its socioeconomic and aesthetic desirability, matters upon which we may not pass. To the extent that the fate of this multibillion dollar project remains, in an increasingly forbidding economy, a matter of social and political volition, the controlling judgments as to its merits are the province of the policy-making branches of government, not the courts.

Motion seeking leave to file reply appendix granted.

Concur—Gonzalez, J.P., Sweeny and DeGrasse, JJ.

Catterson, J., concurs in a separate memorandum as follows: Because I believe that the Urban Development Corporation Act (UDCA) (L 1968, ch 174, § 1, as amended) (McKinney's Uncons Laws of NY § 6251 *et seq.*) is ultimately being used as a tool of the developer to displace and destroy neighborhoods that are "underutilized," I write separately. I recognize that long-standing and substantial precedent requires a high level of deference to the Empire State Development Corporation's (hereinafter referred to as ESDC) finding of blight. Reluctantly, therefore I am compelled to accept the majority's conclusion that there is sufficient evidence of "blight" in the record under this standard of review. However, I reject the majority's core reasoning, that a perfunctory "blight study" performed years after the conception of a vast development project should serve as the rational basis for a determination that a neighborhood is indeed blighted.

The Atlantic Yards Arena Redevelopment Project (hereinafter referred to as the Project) covers 22 acres in the Prospect Heights neighborhood of Brooklyn. Defendant Forest City Ratner Companies, LLC (hereinafter referred to as FCRC) is the developer of the Project, the largest single-developer project in New York City history. Five of the eight city blocks encompassed by the Project are within the Atlantic Terminal Urban Renewal Area (hereinafter referred to as the ATURA), including eight acres owned by the Metropolitan Transportation Authority (MTA) (hereinafter referred to as Vanderbilt Yards) for use as a below-grade rail yard. The remaining three blocks, 1127, 1128 and 1129, comprise almost 40% of the Project footprint and are not included within the ATURA (hereinafter referred to as non-ATURA). These three blocks are privately-owned contiguous blocks located on the south side of Pacific Street, directly across from the Vanderbilt Yards.

FCRC purchased large portions of these blocks over the past several years. Now, codefendant ESDC, a quasi-governmental

organization, has labeled the whole area "blighted" and intends taking the lots not owned by FCRC by eminent domain.

In 1968, the ATURA was established by the City of New York to facilitate the redevelopment of an admittedly blighted area of Prospect Heights in Brooklyn. The redevelopment plan for this area has undergone several revisions, the most recent in 2004. In all of those years, the ATURA area has only been expanded once. Several redevelopment projects have been undertaken within the ATURA since its inception and the Vanderbilt Yards are the primary portion of the ATURA that remain undeveloped.

In December 2003, Mayor Bloomberg, FCRC's principal, Bruce Ratner, and other notables publicly announced that the New Jersey Nets professional basketball team would be purchased by Ratner and moved to Brooklyn to a new arena proposed as part of a multiuse development project.

Progress through the various bureaucratic processes was facilitated by the State through ESDC, a nonelected, quasi-public corporation. The first memorialization of the cooperation between the entities was a memorandum of understanding executed on February 18, 2005 between New York City, the ESDC and FCRC. That same day, and without first issuing a request for proposals, the MTA entered into an agreement with FCRC giving FCRC rights to develop above the MTA's Vanderbilt Yards. Three months later, the MTA belatedly issued a request for proposals (hereinafter referred to as RFP). Three months after that, the MTA accepted FCRC's bid.

On September 16, 2005, just two days after the MTA's acceptance of FCRC's bid, the ESDC designated itself as the lead agency for the Project under the State Environmental Quality Review Act (hereinafter referred to as SEQRA) and noted for the first time that this project was intended to cure "blight" in the privately owned non-ATURA blocks at issue. Over the next year or so, FCRC and related entities purchased many properties in the Project area. These FCRC properties remained largely vacant as the ESDC conducted the scoping process required under SEQRA. This included an economic impact statement and a "blight study." The documents necessary to these studies were prepared either directly by or with the close assistance of AKRF, Inc. (hereinafter referred to as AKRF), its perennial environmental consultant.[1]

On March 31, 2006, the final scoping document was released

---

1. It should be noted that AKRF and the ESDC were recently criticized by this Court for their failure to maintain a relationship separate and distinct from the developer in another gargantuan project. (*See Matter of Tuck-It-*

by the ESDC. By May, FCRC and its subsidiaries had acquired a majority of the properties in the three non-ATURA blocks in the Project area. AKRF's "blight study" was completed, signed by ESDC, and published with the general project plan (hereinafter referred to as the plan) on July 18, 2006. Six days later, on July 24, the plan was released along with a draft environmental impact statement (hereinafter referred to as the DEIS). Among the 3,000-plus pages, there was a notice of public hearing to be held on August 23, 2006 and a notice that the ESDC would accept written comments until September 22, 2006.

The public hearing held on August 23, 2006, drew a crowd of hundreds of local residents. Many were denied access due to overcrowding. The hearing ran three hours overtime, and subsequently two community forums were held on September 12 and 18, 2006.

Despite substantial adverse public response to the findings reported in the DEIS and the plan, a final environmental impact statement (hereinafter referred to as the FEIS) was accepted by the ESDC's Board of Directors on November 15, 2006. Within days, however, it was discovered that the FEIS had erroneously omitted all of the written comments submitted by members of the community; under SEQRA these were required to be addressed.

A new DEIS was prepared and accepted by the ESDC Board on November 27, 2006. On December 8, 2006, AKRF provided the ESDC with a memorandum addressing the written comments received by the public on the blight study. Sparing not a minute for reflection, the ESDC reviewed the memorandum and approved its SEQRA findings and the plan that same day. On December 13, 2006, the MTA's Board of Directors moved with equal alacrity and approved a "summary" of the SEQRA findings. On December 20, 2006, the New York Public Authorities Control Board also approved the Project.

On April 5, 2007, the petitioners commenced a CPLR article 78 proceeding and action for declaratory judgment by order to show cause, seeking a temporary and preliminary injunction of FCRC's demolition and construction of the Project. On April 20, 2007, they were denied a temporary restraining order, and on January 11, 2008, the court below denied the motion for a preliminary injunction. In this article 78 proceeding, the petitioners challenge, inter alia, ESDC's reliance on AKRF's "blight

*Away Assoc., L.P. v Empire State Dev. Corp.*, 54 AD3d 154 [2008, Catterson, J.].)

study" to support a determination of blight in the non-ATURA blocks.

Judicial review of this administrative determination is limited to consideration of whether or not that determination is rationally supported. AKRF's report must be viewed as a whole to determine whether ESDC had a rational basis for accepting the findings of blight; namely, whether the blight finding is supported by evidence of record. The UDCA circumscribes the power of the ESDC and limits ESDC to certain enumerated types of development projects. (Uncons Laws § 6253 (6) (a)-(c); § 6254 [UDCA § 3 (6) (a)-(c); § 4].) The ESDC, pursuant to the UDCA, classified the subject project as a land use improvement project, which is: "A plan or undertaking for the clearance, replanning, reconstruction and rehabilitation or a combination of these and other methods, of a substandard and insanitary area, and for recreational or other facilities incidental or appurtenant thereto, pursuant to and in accordance with article eighteen of the constitution and this act. The terms 'clearance, replanning, reconstruction and rehabilitation' shall include renewal, redevelopment, conservation, restoration or improvement or any combination thereof as well as the testing and reporting of methods and techniques for the arrest, prevention and elimination of slums and blight." (§ 6253 [6] [c].)

The term "substandard or insanitary area" has a specific meaning under the UDCA: "a slum, blighted, deteriorated or deteriorating area, or an area which has a blighting influence on the surrounding area, whether residential, non-residential, commercial, industrial, vacant or land in highways, waterways, railway and subway tracks and yards, bridge and tunnel approaches and entrances, or other similar facilities." (§ 6253 [12].)

Additionally, the ESDC must make a twofold determination: "That the area in which the project is to be located is a substandard or insanitary area, or is in danger of becoming a substandard or insanitary area and tends to impair or arrest the sound growth and development of the municipality." (Uncons Laws § 6260 [c] [1] [UDCA § 10 (c) (1)].)

There is no dispute that the MTA allowed the portion of the Project footprint which it owns, the Vanderbilt Yards, to deteriorate into a substandard, unsanitary, and blighted condition. Furthermore, there is no dispute the blight designation for that area was made decades before the Project was conceived. That portion of the Project area falls squarely within the bounds of the ATURA. However, the important question presented by this appeal is whether there is a rational view of the evidence

which supports the ESDC's determination, that the non-ATURA portion of the Project area—tax blocks 1127, 1128, and 1129, which lie south of Pacific Street—was "substandard or insanitary" under the UDCA.

In my view, any determination that these blocks were substandard or insanitary should properly be based on a snapshot of the conditions that prevailed at the time that the Project was announced by FCRC in 2003. Any blight study that does not reflect this temporal limitation would necessarily allow the mere announcement of the massive project to predetermine the outcome of the study. On this point, I believe that the petitioners argue persuasively that any proposed or intended development in these blocks such as the Project would curtail any other private development; and that no new development would occur on property that might be subject to the broad powers of condemnation as wielded by a coalition of the ESDC and FCRC.

The ESDC purported to set out the factors that its consultant AKRF should consider in its blight study. In its contract with AKRF, the ESDC stated that: "The characteristics of blight can include, but are not limited to: physical deficiencies (insanitary/substandard building conditions, building/housing/fire code violations, site vacancy or underutilization), economic deficience (building vacancies, low rents, high rental turnovers) or other deficiencies (incompatible land uses, multiple ownerships that hamper assemblage of properties, traffic congestions, pollution). Taken together, these characteristics may demonstrate that the area under study is substandard, insanitary, or deteriorating."

The contract also provided specific criteria and methodology to be used in preparation of the study:

"Using currently available data and information from ESDC and DCP, and if necessary a supplemental survey, we will document and record patterns of ownership, utilization of the sites, land use, zoning, and physical conditions for the affected area. This work will also draw on information being gathered for the land use task being performed for the EIS effort, including maps and other graphical data.

"More specifically, the blight study will include the following tasks:

"A. Determine the study area for analysis of blight conditions and prepare and draft criteria that will be used as the basis for the blight study area, in consultation with state and city agencies, including ESDC and DCP.

"B. Document blighted conditions, including the following:

"• Analyze residential and commercial rents on the project site and within the study areas;

"• Analyze assessed value trends on the project site, and compare to sample blocks with comparable uses in the study area, such as the Atlantic Center;

"• Describe residential and commercial vacancy trends;

"• Compare current economic activity on the project site, such as direct and indirect employment, with relevant surrounding sites;

"• Review New York City Police Department (NYPD) crime statistics for the affected area; and

"• Identify physical conditions, including New York City Department of Buildings (DOB) building code and other pertinent violations (e.g. New York City Fire Department, Department of Environmental Projection, etc.), and determine Certificate of Occupancy compliance on the project site.

"C. Identify/estimate the public benefit generated by the proposed project, including estimates of construction period and operating period, including direct and indirect employment, wages and salaries, and non-real estate taxes generated. This task assumes that an economic and fiscal impact analysis has been previously performed by AKRF for FCR Sports, LLC."

The blight study, however, seamlessly combined the ATURA area with the three non-ATURA city blocks. The "executive summary" to the blight study, in a less than admirable sleight of hand, sets out the goals for the ATURA that were articulated in 2004. That study succinctly captures the respondents' view of the entire project and this litigation. The summary begins with observations limited to the ATURA and the City's most recent plan for the ATURA; the 10th amendment to a plan originally drafted in 1968:

"• Redevelop the Area in a comprehensive manner, removing blight and maximizing appropriate land use.

"• Remove or rehabilitate substandard and insanitary structures.

"• Remove impediments to land assemblage and orderly development.

"• Strengthen the tax base of the City by encouraging development and employment opportunities in the Area.

"• Provide new housing of high quality and/or rehabilitated housing of upgraded quality.

"• Provide appropriate community facilities, parks and recreational uses, retail shopping, public parking, and private parking.

"• Provide a stable environment with the Area which will not be a blighting influence on surrounding neighborhoods."

Thus, AKRF was tasked with reconciling the goals of redevelopment with the actual conditions as they existed in both the ATURA and non-ATURA properties at the time the study was conducted.

In my view, the petitioners are correct in asserting that the blight study failed to comport with the majority of the specific criteria set out in AKRF's contract. Furthermore, ESDC's contention that "as a matter of law," ESDC could only look at conditions contemporaneous with the study, which was conducted years after the announcement, is ludicrous on several levels.

Initially, it should be noted that ESDC offers no legal support for that claim other than the obvious point that ESDC is permitted by statute to revitalize blighted areas. Second, ESDC's contract with AKRF as described above, clearly contemplated that AKRF would analyze both assessed value *trends* and current economic activity at the site and surrounding area. Finally, the obvious point raised by petitioners and dismissed by ESDC is that if the non-ATURA properties were in the midst of an economic revival, it would be counter to ESDC's mandate to step in, stop all productive development, and, in partnership with a private enterprise, develop the neighborhood according to its own vision of urban utopia, complete with professional basketball for the masses.

It is undisputed that the record contains several examples of redevelopment in this area that occurred prior to the announcement of the Project. In 2002, the Spalding Factory across from the Vanderbilt Yards was converted into 21 loft condominiums; Newswalk, a 137-unit luxury condominium building opened in the former Daily News printing plant; and the Atlantic Art Building opened with 31 luxury condominium units in 2003.

Other developers in the area have also filed plans with the Buildings Department for conversion of space from industrial to housing. This rapid, private residential redevelopment of the area was commonly known and publicly reported in newspapers and periodicals. Even after the ESDC's announcement of the Project, surrounding property values continued to climb with townhouses selling for as much as $1.5 million last year. Newswalk, whose market value is high whether through direct purchase or eminent domain, has been carved out of the Project's plan.[2]

Were this redevelopment more expansive and pervasive in the non-ATURA area, the petitioners would carry the day. Unfortunately for that position, FCRC's purchase of a significant portion of the non-ATURA area as well as many other dilapidated properties still held in private ownership and set out in the record supports, by the barest minimum, the agency's determination of blight. It is clearly within the agency's expertise to consider the effect of FCRC's conscious decision to allow its properties located within the non-ATURA area to lay fallow.

While I deplore the destruction of the neighborhood in this fashion, I cannot say, as a matter of law, that the ESDC did not have sufficient evidence of record to find "blight." [See 2008 NY Slip Op 30104(U).]

2. Should ESDC be able to take the properties within the scope of the Project by eminent domain, the condominium units at the former Spalding Factory and the Atlantic Art Building, located on the same block, will be demolished.